# United States Court of Appeals
## For the First Circuit

---

No. 00-1016
    00-1710

UNITED STATES,
Appellant,

v.

JOHANNES TRUEBER,
Defendant, Appellee.

---

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]
[Hon. Robert B. Collings, U.S. Magistrate Judge]

---

Before

Selya, Circuit Judge,
Wallace,* Senior Circuit Judge,
and Boudin, Circuit Judge.

---

    Kevin P. McGrath, Assistant U.S. Attorney, with whom
Donald K. Stern, United States Attorney, was on brief, for
appellant.
    Dennis J. Kelly, by appointment of the Court, with whom
David M. Losier and Burns & Levison LLP were on brief, for
appellee.

---

January 30, 2001

---

WALLACE, <u>Circuit Judge</u>.  The government appeals from the district court's dismissal of the indictment against defendant Johannes Trueber based upon a violation of Trueber's Sixth Amendment right to a speedy trial.  The government also appeals from the district court's previous decision to suppress statements made by Trueber during an automobile stop and during a subsequent search of his hotel room.  The district court had jurisdiction pursuant to 18 U.S.C. § 3231.  We have jurisdiction over these timely filed appeals pursuant to 18 U.S.C. § 3731. We reverse in part, vacate in part, and remand.

I

We rely on the testimony of United States Customs Special Agent Pugliesi, which the district court accepted as true in deciding the suppression motions. On the evening of March 20, 1999, Gabriel Lemmerer arrived at Boston's Logan Airport on a flight from Aruba.  United States Customs Special Agents arrested Lemmerer after a search of his luggage revealed five kilograms of cocaine.  Among the items seized from Lemmerer were a receipt from a Hampton Inn in North Andover, Massachusetts, and a note containing Trueber's name

and a confirmation number.

Special Agent Lenzie was dispatched to monitor whether anyone would attempt to contact Lemmerer at the Hampton Inn. Arriving at the hotel after midnight, Lenzie learned that several individuals had called requesting to speak to Lemmerer. The next afternoon Agent Pugliesi, the lead investigator in the case, met Lenzie at the Hampton Inn. Lenzie informed Pugliesi that a man called Johannes Trueber had checked into the hotel after being dropped off by a taxi or limousine, and that a license plate search linked the vehicle to a company currently under investigation by United States Customs for drug trafficking and money laundering. Further, Lenzie informed Pugliesi that inspectors at Logan Airport had obtained Trueber's American Airlines flight itinerary, which contained a contact telephone number linked to another company under investigation for drug trafficking and money laundering. Both companies were owned by the same person and were located at the same address in Lawrence, Massachusetts.

While at the Hampton Inn, Pugliesi acquired additional information linking Trueber to Lemmerer: (1) Trueber had arrived at Logan Airport the previous day from Aruba at roughly the same time as Lemmerer (however, they were

not on the same flight – Trueber stopped in Miami before flying to Boston); (2) they had traveled together from the Dominican Republic to Boston in January 1999 and from Boston to Aruba; (3) they traveled between Aruba and the Boston area again in late February or early March 1999; and (4) they stayed in the same hotel room at the Hampton Inn from March 1 to March 7, 1999.

While gathering this information, the agents set up surveillance from a hotel room across the hall from Trueber's room. The agents observed Trueber leave the hotel on three occasions to use payphones at a nearby convenience store (Seven Eleven). After observing these trips, Pugliesi, accompanied by Special Agent Colleen Forgetta, went to the hotel lobby and asked the desk clerk if he had had any contact with Trueber in the course of Trueber's coming and going. The desk clerk informed them that Trueber had asked him if the hotel sold telephone calling cards. Informing Trueber that they were sold out, the clerk directed him to the Seven Eleven. Pugliesi and Forgetta drove to the Seven Eleven, confirmed that it sold calling cards, and, on their return, observed Trueber leave the hotel and walk toward the Seven Eleven carrying a suitcase. Because Trueber had checked in with four or five pieces of luggage, Pugliesi suspected that

-4-

Trueber was planning to deliver the suitcase to someone and that it contained evidence of the drug smuggling conspiracy. Accordingly, Pugliesi directed Forgetta to contact the Lawrence Police Department and request that it send a vehicle to the scene.

Trueber entered the Seven Eleven and waited near the front door. Approximately ten minutes later, a white Isuzu pickup truck drove into the Seven Eleven parking lot. Trueber left the store, placed the suitcase in the outside flatbed of the truck, and entered the passenger side. As the truck drove out of the parking lot, a Lawrence police car arrived on the scene, and Pugliesi directed the police officers to stop the truck, informing them that it might contain drugs.

The police car drove behind the truck and activated its lights. The truck pulled over immediately and the police car parked approximately five feet behind it. Pugliesi and Forgetta parked behind the police. Pugliesi and the Lawrence police officers instructed Trueber and the driver to step outside the truck. When Trueber got out, Pugliesi, who was positioned on the passenger side, was carrying his revolver at his side, pointed toward the ground. Lenzie arrived on the scene as Pugliesi instructed Trueber to step away from the truck and toward the side of the road. Pugliesi testified

that he was not aware if Trueber saw his weapon and stated that "[m]y idea was not to show Trueber that I had a gun. It was just to have it for safety." Re-holstering his gun, Pugliesi asked Trueber to turn around, put his hands behind his head, and spread his legs. Pugliesi frisked Trueber for weapons, found none, and removed nothing from Trueber's person.

Pugliesi next asked Trueber to put his hands down, turn around, and face him. Pugliesi identified himself as a United States Customs official and asked Trueber for identification. Trueber produced an Austrian passport, which Lenzie inspected. Pugliesi asked Trueber when he arrived in the United States and where he was from, and Trueber responded that he had arrived the previous day, that he lived in the Dominican Republic, and that he was an Austrian national. Pugliesi asked him if he had placed anything in the truck. Trueber identified the suitcase. Pugliesi asked to take a look at the suitcase, and Trueber consented. Inside, Pugliesi discovered a green bag and a container of talcum powder. Inside the green bag was another bag containing hotel soap bars. There was nothing else inside the suitcase. Pugliesi testified that, while sounding innocuous, the objects he located did not obviate his suspicion and, in fact, heightened

it.  First, he had learned from experience that drug smugglers often used "scented objects such as soaps or talcs ... that give a fresh smell to conceal any scent of the drugs that might be detected by dogs."  Further, he observed that the green bag was the same color and brand as one of Lemmerer's pieces of luggage seized the night before at the airport.

Pugliesi questioned Trueber why he was in the Lawrence area, and Trueber replied that he had traveled from Aruba to purchase clothing.  He inquired as to Trueber's relationship with the driver of the truck, and Trueber responded that he had met the man earlier that day at a shopping mall and that he was meeting him that evening to give him his suitcase.  Trueber maintained that the driver needed extra luggage.  Pugliesi asked him where he had stayed the night before, to which Trueber replied that he had stayed at the driver's house in Lawrence.  Pugliesi thought this inconsistency strange:  how could Trueber have stayed at the driver's house the night before when he asserted to have just met him that day?  When asked the name of the driver, Trueber stated it was Ramirez.

Meanwhile, the Lawrence police officers and Forgetta were interviewing the driver on the other side of the truck. The police officers had directed the driver to step out of the

truck, walk backwards toward them, and either get on his knees or lie flat on his stomach. Pugliesi did not see either of the officers display their weapons. The officers then instructed the driver to stand and place his hands on the hood of the police car. After some difficulty, the officers ultimately learned that his name was Ramon Gonzalez and that he lived in Lawrence with his girlfriend at 46 Crescent Street. They retrieved from him a room key and a receipt from the Tage Inn, which had Trueber's name on it. One of the officers handed the key and the receipt to Pugliesi and informed him of the driver's name. Pugliesi realized that it was different from the name Trueber had given him.

When asked about the receipt, Trueber admitted that he had stayed at the Tage Inn the prior evening. When asked again why he had entered the truck, Trueber repeated that he had planned to have a beer with the driver and was going to give him the suitcase because the driver needed extra luggage. He also stated that he planned on leaving early the next morning on a flight to the Dominican Republic. Trueber's contradictory answers regarding the driver's name and where he had stayed the previous night heightened Pugliesi's suspicion.

The encounter with Trueber began approximately 10 p.m. on a rainy evening and lasted approximately ten to

fifteen minutes. As the rain grew harder, Pugliesi asked Trueber if they could go back to his room at the Hampton Inn to continue their discussion and if he could search his luggage at the hotel. Trueber consented. Pugliesi and Trueber began to walk the roughly 200-250 yards to the hotel with Trueber when Pugliesi suggested that they drive the rest of the way in Lenzie's van, which was parked between them and the hotel. Trueber consented. Both men sat in the back seat, and Trueber was not handcuffed or physically restrained in any way.

Once back at the hotel, Trueber led Pugliesi and Lenzie to his room, opened the door, and freely entered with the agents. Once inside, the agents asked Trueber to sit down. Pugliesi and Lenzie briefly searched the room for weapons and persons. Next, they resumed questioning Trueber while searching his luggage. Pugliesi again asked Trueber why he was visiting Lawrence. When Trueber replied that he was there to buy clothing, Pugliesi asked him if he had any receipts. Trueber said no. While inspecting the billfold containing Trueber's travel information, Pugliesi found an index card containing typed information, including the address 46 Crescent Street and a woman's name. Trueber denied knowing anyone at that address, yet when Pugliesi informed him that it

was the same address given by the driver of the truck and asked him to explain how this typed information was in his papers when he had just met the driver that day, Trueber admitted that he had met the driver on previous trips to the United States and that the woman was someone he visited when in the country.

The agents next asked Trueber if he had any money with him and Trueber stated that he had traveled to the United States with $9,000, that he had approximately $6,500 remaining, and that he had spent the difference on clothes. The search of his luggage revealed several recently purchased clothing items, but the price tags and other markings on the clothes indicated that they were purchased outside the United States. The only items clearly purchased in the United States were toiletries from a drug store, whose cumulative cost was far less than the unaccounted-for $3,500. When asked his profession, Trueber cryptically stated that he loaned people money.

The agents next inquired as to Trueber's relationship with Lemmerer. Trueber informed them that he had just spent a few weeks with Lemmerer in Aruba at the Lafayette Hotel, that he and Lemmerer resided in the same town in the Dominican Republic, and that they were both Austrian. When

-10-

asked had he planned to meet Lemmerer at the Hampton Inn, Trueber said yes. The agents then informed Trueber that Lemmerer had been arrested the night before with five kilograms of cocaine in his luggage, and asked him if he knew anything about the situation. Expressing surprise, Trueber asserted that he knew nothing about it and did not know why Lemmerer was traveling to Lawrence. However, he stated that he and Lemmerer had planned to fly back to the Dominican Republic the next day. Pugliesi saw that Trueber's ticket, as well as Lemmerer's, showed a scheduled return flight to the Dominican Republic on March 30, 1999, nine days later.

When the discussion began, Pugliesi and Lenzie were the only Customs agents in the room with Trueber. Approximately ten to fifteen minutes later, Forgetta arrived, and the three agents alternately went in and out of the room during the course of the encounter, traveling between Trueber's room and the surveillance room across the hall. At one point, a fourth agent came to the room with the flight information that had been gathered at Logan Airport, but did not stay more than a few minutes, and did not cross the threshold into the room.

During the interview, Pugliesi informed Trueber "once, possibly twice," that he was not under arrest. He

testified that he first advised Trueber that he was not under arrest when they entered the room. Later, when questioned as to why he was in the Lawrence area, Trueber queried: "I'm just here. Is there anything illegal about that, am I under arrest?" Pugliesi allegedly replied: "No, you're not under arrest. We are just questioning you."

At one point during the interview when Trueber indicated that he needed to use the bathroom, the agents conducted a brief weapons check of the bathroom, and then instructed Trueber to keep the door ajar for safety reasons while he urinated. At another point in the interview, when Trueber began to get up from his chair to help the agents locate something in one of his bags, the agents told him, "please, we'll find it," indicating that they wanted Trueber to remain seated.

At no point during the interview did Trueber indicate that he did not wish to answer questions or that he did not want the agents to search his luggage. He did not ask the agents to leave the room, and he did not ask to speak with a lawyer. After approximately one hour and twenty minutes, the agents placed Trueber under arrest. When informed that he was under arrest, Trueber replied: "Okay. Well, then I can't answer any more questions. I need an attorney." Pugliesi

informed Trueber that he would not ask him any more questions and advised him of his Miranda rights.

Trueber was charged with conspiracy to import slightly under five kilograms of cocaine into the United States in violation of 21 U.S.C. § 963. After a probable cause and detention hearing held on March 31, 1999, a magistrate judge of the District of Massachusetts ordered Trueber detained pending trial. He found Trueber to be a flight risk given that he was an Austrian national who resides in the Dominican Republic and has no ties to the United States. On April 28, 1999, Trueber and Lemmerer each were indicted on one count of conspiracy to import cocaine into the United States in violation of 21 U.S.C. § 963, one count of importation of cocaine in violation of 21 U.S.C. § 952(a), and one count of aiding and abetting in violation of 18 U.S.C. § 2. Trueber was arraigned on May 28. The magistrate judge ordered the period between April 28 and May 27 excluded from the Speedy Trial Act (STA), 18 U.S.C. § 3161, calculation on the ground that the delay was necessary so that the court "could obtain the services of a qualified German interpreter who was not available until May 28, for arraignment."

On July 12, the district court conducted an initial status conference in the case and set a trial date of

September 30.  On August 9, Trueber filed a motion to suppress statements and physical evidence, and on September 17, the district court rescheduled the trial to October 25.  The hearing on the suppression motion began on September 24 and continued on October 15, when the district court orally granted Trueber's motion to suppress statements and sua sponte severed the trial of Trueber and Lemmerer based upon perceived Bruton concerns.  Jury selection for Lemmerer's trial began on October 18.  The district court resumed Trueber's suppression hearing on October 26 and denied the motion to suppress physical evidence that same day.  The court scheduled Trueber's trial to commence as soon as Lemmerer's ended.

On November 12, the government timely filed a notice of appeal from the district court's order suppressing Trueber's statements.  As of that date, only sixteen days had expired on the STA clock since Trueber's arrest on March 21.  On December 2, Trueber filed a motion to be released pending the appeal and, during a December 16 hearing on the motion, he moved orally to dismiss the indictment for lack of a speedy trial.  The district court denied the motion without prejudice.  However, at a January 28, 2000, bail hearing, the district court stated that it would accept briefs on the subject, and in a February 8 order for further briefing, the

-14-

district court "reported to the parties . . . that the assembly of the . . . record in this appeal – conduct that ought routinely to take about seven days – here took at least 55 days, from November 12, 1999 to January 6, 2000, when a clerk in the Court of Appeals indicated that it had some of the papers."  Consequently, the court "invited [the parties] to brief the issue whether the failure timely to process this appeal – a failure that kept Mr. Trueber in custody approximately 48 days for no reason – warrants any relief, and, if so, what that relief ought to be."

On February 22, 2000, Trueber filed a motion seeking dismissal of the indictment, asserting that his Sixth Amendment right to a speedy trial had been violated.  The district court denied the motion on February 24 on the ground that the court lacked subject matter jurisdiction to determine the issue because of the pending appeal before this court.  However, the court advised Trueber to petition this court either for an expedited hearing on the government's appeal or for a remand to the district court to consider the motion.

On March 9, Trueber filed a motion in this court to remand for a ruling on his motion to dismiss for lack of a speedy trial.  In an order dated March 15, we stated that we retained jurisdiction, but we authorized the district court to

-15-

act on Trueber's motion to dismiss the indictment.  On May 19, the district court dismissed the indictment with prejudice on the ground that Trueber's constitutional right to a speedy trial had been violated.

II

First, the government contends that the district court erred in dismissing the indictment against Trueber.  The government argues that the district court improperly based its dismissal on post-accusation delays attributable to the government's interlocutory appeal from the district court's order to suppress statements.  We review a district court's ruling on a Sixth Amendment speedy trial claim for abuse of discretion.  United States v. Salimonu, 182 F.3d 63, 69 (1st Cir. 1999).

In Barker v. Wingo, 407 U.S. 514 (1972), the Supreme Court established a four-part balancing test a court should consider to determine whether a defendant's Sixth Amendment right to a speedy trial has been violated:  "(1) the length of the delay; (2) the reasons for the delay; (3) the defendant's assertion of his speedy trial right; and (4) the prejudice to the defendant caused by the delay."  United States v. Munoz-Amado, 182 F.3d 57, 61 (1st Cir. 1999); see also Barker, 407 U.S. at 530.  None of the four factors is "either a necessary

or sufficient condition to the finding of a deprivation of the right of speedy trial.  Rather, they are related factors and must be considered together with such other circumstances as may be relevant."  Munoz-Amado, 182 F.3d at 61, quoting United States v. Henson, 945 F.2d 430, 437 (1st Cir. 1991).

### A.

The first factor "is actually a double inquiry." United States v. Doggett, 505 U.S. 647, 651 (1992). Initially, simply to trigger speedy trial analysis, the defendant must allege that the delay has "crossed the threshold dividing ordinary from 'presumptively prejudicial' delay, since, by definition, he cannot complain that the government has denied him a 'speedy' trial if it has, in fact, prosecuted his case with customary promptness."  Id. at 651-52, quoting Barker, 407 U.S. at 530-31.  If the defendant makes this showing, "the court must then consider, as one factor among several, the extent to which the delay stretches beyond the bare minimum needed to trigger judicial examination of the claim."  Id. at 652.

Because of "the imprecision of the right to speedy trial," the length of delay sufficient to trigger the analysis "is necessarily dependent upon the peculiar circumstances of the case."  Barker, 407 U.S. at 530-31.  In Doggett, the

-17-

Supreme Court observed, however, that, "[d]epending on the nature of the charges, the lower courts have generally found post accusation delay 'presumptively prejudicial' at least as it approaches one year." 505 U.S. at 652 n.1.

The speedy trial right attaches upon arrest or indictment, whichever occurs first. Munoz-Amado, 182 F.3d at 61. For Trueber, it attaches on March 21, 1999, when he was arrested. He was ordered detained pending trial on March 31, 1999, and has remained in custody ever since. Accordingly, Trueber's period of post-accusation delay and incarceration now approaches twenty-two months (of course, it was somewhat less when the district court ruled, and even less than that when Trueber filed his dismissal motion). We shall assume that this delay is "presumptively prejudicial" so as to trigger further inquiry. See, e.g., id. (assuming that a nineteen-month delay was presumptively prejudicial); United States v. Santiago-Becerril, 130 F.3d 11, 21 (1st Cir. 1997) (assuming that a fifteen-month delay was presumptively prejudicial); United States v. Colombo, 852 F.2d 19, 24 (1st Cir. 1988) (holding that a twenty-four-month delay was long enough to be presumptively prejudicial).

In determining the weight we should give this delay in the Barker analysis, we examine the extent to which the

-18-

delay exceeds the bare minimum considered presumptively prejudicial. See Doggett, 505 U.S. at 652; Barker, 407 U.S. at 530-31. Trueber has waited over twenty-two months for the commencement of trial in this case, "a case more complicated than 'an ordinary street crime' but less so than 'a serious, complex conspiracy charge.'" Munoz-Amado, 182 F.3d at 62, quoting Barker, 407 U.S. at 531. Arguably, therefore, the period of the delay is long enough "to tip the scales slightly in favor of [Trueber's] claim." Id. (nineteen-month delay in cocaine importation conspiracy enough to tip balance in favor of defendant).

### B.

The second factor, the reasons for the delay, has been described as "[t]he flag all litigants seek to capture," United States v. Loud Hawk, 474 U.S. 302, 315 (1986), and is often considered the "focal inquiry." Munoz-Amado, 182 F.3d at 62 (internal quotation and citation omitted). In Barker, the Supreme Court held that "different weights should be assigned to different reasons." Barker, 407 U.S. at 531. While a "deliberate attempt to delay the trial in order to hamper the defense" would be weighed heavily against the government, "a more neutral reason such as negligence or overcrowded courts" would be weighed "less heavily." Id.

In its dismissal of the indictment, the district court asserted three reasons for the delay, each attributable to the government's interlocutory appeal. First, the district court found that fifty-five days elapsed between the date the government filed its notice of appeal and the date the district court clerk's office delivered the record to this court. The district court concluded that this was far longer than it should have taken, stating that "forty-eight days of time was just dead time because this Court failed properly to pay sufficient attention to Mr. Trueber's case to get it over to the Court of Appeals." Moreover, regarding the strength of the government's appeal, the district court added, "[T]hat's what makes this so, candidly, so absolutely difficult . . . .Because I think that I'm absolutely right on the motion to suppress . . . . If I were the only court to hear this, I would think there is very little to this case."

While delays in bringing the case to trial caused by the government's interlocutory appeal may be weighed in determining whether a defendant has suffered a violation of his rights to a speedy trial, "[g]iven the important public interests in appellate review . . . it hardly need be said that an interlocutory appeal by the Government ordinarily is a valid reason that justifies delay." Loud Hawk, 474 U.S. at

-20-

315.  In Loud Hawk, the Supreme Court identified the factors courts may consider in assessing the purpose and reasonableness of an interlocutory appeal: (1) the strength of the government's position on the appealed issue; (2) the importance of the issue in the posture of the case; and (3) in some cases, the seriousness of the crime.  Id.  In this case, as explained later, contrary to the district court's assertion, the government's position on the suppression of Trueber's statements is strong.  Second, the exculpatory statements made by Trueber are germane to the government's case and are not "clearly tangential and frivolous."  Id. at 316.  Third, this case involves the importation of nearly five kilograms of cocaine into the United States, which is a serious crime.  Moreover, "there is no showing of bad faith or dilatory purpose on the part of the government."  Id.  Indeed, in dismissing the indictment, the district court expressly stated that it did not "fault [the government] for invoking their procedural remedies [to seek an] interlocutory appeal on the motion to suppress . . . ."  Finding no misconduct on the part of the government, the district court observed: "[w]hen called upon to take a position they have taken the position . . . promptly and adequately."

Neither Trueber nor the district court point to any

authority to support weighing in Trueber's favor a delay in assembling the record for a reasonable and legitimate interlocutory appeal. There is no showing of "bad faith" or "dilatory purpose" on the part of the government; in fact, the delay is not attributable to any conduct or omission on the part of the government. On the contrary, this delay is attributable to the district court clerk's office. Further, there is no showing that a fifty-five day period between filing a notice of appeal and assembling the record for appeal is a reason for delay deserving weight under <u>Barker</u>. In fact, in its order for further briefing on February 8, 2000, the district court observed that thirty-six percent of criminal appeals "taken from this district over the last sixth months of 1999 took forty days or longer to process." While this "neutral" reason for delay "nevertheless should be considered" under <u>Barker</u>, 407 U.S. at 531, it does not deserve "any effective weight." <u>Loud Hawk</u>, 474 U.S. at 316.

The second reason for delay identified by the district court was a period of twenty-one days, which it attributed to itself, stating that it "[bore] some direct responsibility" for not holding a more timely hearing on Trueber's speedy trial motion. While the government's appeal was pending, we issued an order on March 15, 2000, authorizing

the district court to act on Trueber's motion to dismiss for lack of speedy trial. The district court did not hold a hearing on the motion until May 19. The district court judge explained that the hearing was not held sooner because he was on vacation for two weeks, and the district court caused an additional seven days of delay by "just shuffling" before directing the district court clerk to call the case for a hearing on the motion. Again, no authority supports granting this relatively short and "neutral" period of delay, attributable to the district court, any effective weight towards Trueber's speedy trial claim.

Third, the district court scolded the government for what it perceived to be the government's contribution to Trueber's post-accusation delay. The court stated that when a defendant has been in custody "approaching a year, and certainly after a year," the government has a responsibility "to be a very squeaky wheel . . . ." As the court explained, "I expect calls, I expect letters. I expect it to be thrust upon me . . . . So there's fault there [on the part of the United States Attorney]." However, as explained earlier, the district court did not impugn the motives of the government, stating that "there is . . . certainly not misconduct [on the part of] the government . . . ." and "[w]hen called upon to

-23-

take a position they have taken the position . . . promptly and adequately."  With no showing of "bad faith" or "dilatory purpose," id., we conclude there should be no weighing against the government for this amorphous period of delay while the government's interlocutory appeal was pending before this court.

Under the Barker test, "delays in bringing the case to trial caused by the Government's interlocutory appeal may be weighed in determining whether a defendant has suffered a violation of his rights to a speedy trial."  Id.  However, "respondents have failed to show a reason for according these delays any effective weight towards their speedy trial claims."  Id.  We conclude that the reasons identified by the district court for the asserted delays do not justify the "unsatisfactorily severe remedy of dismissal."  Barker, 407 U.S. at 522.

C.

The third factor – the extent to which the defendant has asserted his speedy trial right – "is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right."  Id. at 531-32.  "A defendant should give some indication, prior to his assertion of a speedy trial violation, that he wishes to proceed to trial."

-24-

Munoz-Amado, 182 F.3d at 62.

In this case, no action was taken by Trueber between March 21, 1999, and December 16, 1999, that could be construed as the assertion of the speedy trial right or an indication that Trueber wished to proceed to trial. On the latter date, during a hearing on his motion to be released pending the government's interlocutory appeal, Trueber moved orally to dismiss the indictment for lack of a speedy trial. Thus, for nearly nine months following his arrest Trueber did nothing to expedite his trial, and did not raise the issue until one month after the case was on appeal to this court. Further, after filing his motion seeking dismissal of the indictment on speedy trial grounds on February 22, 2000, Trueber demonstrated a "lack of enthusiasm for the speedy trial right which he now asserts." United States v. Henson, 945 F.2d 430, 438 (1st Cir. 1991) (internal quotations omitted). On February 24, 2000, when the district court dismissed Trueber's motion for lack of jurisdiction, it advised Trueber either to petition this court for an expedited hearing on the government's appeal or for a remand to the district court to consider the motion. Trueber chose the latter. Thus, there is merit to the government's assertion that "Trueber only became interested in invoking the Sixth Amendment when it

became an avenue to dismiss the indictment or obtain release." The record strongly suggests that Trueber did not seek a trial and, instead, "hoped to take advantage of the delay in which he had acquiesced, and thereby obtain a dismissal of the charges." Barker, 407 U.S. at 535.

We have found no law, nor has any been cited to us, to support the district court's position that "a defendant asserts his speedy trial right by pleading not guilty." Further, there is no authority supporting the district court's decision to "count, if you will, that Mr. Trueber has asserted his speedy trial rights at every stage in this proceeding, and I do not count against him in any wise [sic] that he has not formally filed a paper until this motion to dismiss was filed [on February 22, 2000 – 11 months after his arrest]."

D.

The fourth factor – the prejudice to the defendant caused by the delay – "should be assessed in the light of the interests of defendants which the speedy trial right was designed to protect." Barker, 407 U.S. at 532. The Supreme Court "has identified three such interests: (i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." Id. Of these, "the most

serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." Id.

But the district court saw a prejudice by the alleged delay in this case in a different manner, and the question is whether, under Barker, this "prejudice" implicates interests the speedy trial right was designed to protect. The district court reasoned:

> I think presumptively and practically [Trueber] is prejudiced. He's prejudiced in the most practical of senses. The government went to trial first against his co-defendant, Mr. Lemmerer. It resulted in a hung jury . . . . The government['s] evidence at the second trial was more compendious.
>
> Now, Mr. Lemmerer has been convicted . . . . Every day Mr. Trueber waits for his trial bolsters the government's chances as opposed to that of Mr. [Trueber].

We have found no authority to support this notion of prejudice, and it appears to us to be too speculative. Indeed, Trueber acknowledges in his brief to this court that "it is difficult to speculate about the extent to which the pre-trial delay and incarceration will prejudice or impair Trueber's defense other than to say that the government has already used the delay to attempt to gather evidence . . . to . . . supplement . . . [its] case . . . ." Trueber does not

-27-

point to a single authority to support the novel proposition that the potential strength the government's case may acquire over time amounts to prejudice against the defendant. Indeed, "delay is a two-edged sword," Loud Hawk, 474 U.S. at 315, and "is not an uncommon defense tactic," Barker, 407 U.S. at 521, as "[t]he passage of time may make it difficult or impossible for the government to carry [its] burden." Loud Hawk, 474 U.S. at 315.

The mere possibility that the government's case may get stronger with time is not sufficient to support Trueber's position that his speedy trial right was violated. Cf. id. (the possibility of impairment of a fair trial that may result from the absence or loss of memory of witnesses is not sufficient to support respondent's position that their speedy trial rights were violated). Trueber has not provided any support, in the record or otherwise, for his allegation that his defense has been impaired by the delay. "There is no indication here that the period of pretrial delay interfered in any way with [Trueber's] ability to present evidence or obtain the testimony of witnesses, or that it would have any impact on the fairness of his trial." Munoz-Amado, 182 F.3d at 63.

We conclude, therefore, after applying the Barker

balancing test and weighing its several factors, that Trueber's constitutional right to a speedy trial was not violated and, therefore, that the district court abused its discretion. Accordingly, we reverse the district court's dismissal of the indictment against Trueber.

### III

We now turn to the government's appeal from the district court's suppression of all statements made by Trueber on the night of March 21, 1999. The first challenge deals with those statements made when the truck was stopped; the second involves statements made in the hotel room.

### A.

First, the government contends that the district court erred in suppressing Trueber's roadside statements made to Special Agent Pugliesi prior to receiving Miranda warnings. The district court concluded that, for purposes of Miranda, Trueber was in custody when questioned and, therefore, all statements violated Miranda and should be suppressed. The government argues that the initial stop of the vehicle was a valid Terry stop that did not develop into custodial interrogation necessitating the administration of Miranda warnings.

In the context of a motion to suppress, we review a

district court's factual findings for clear error.  See United States v. Owens, 167 F.3d 739, 743 (1st Cir. 1999).  We review a district court's legal conclusions de novo.  Id.

"Miranda warnings must be given before a suspect is subjected to custodial interrogation."  United States v. Ventura, 85 F.3d 708, 710 (1st Cir. 1996).  The custody determination is the initial and central inquiry as it is "'the touchstone to the need for Miranda warnings.'"  Id., quoting United States v. Quinn, 815 F.2d 153, 160 (1st Cir. 1987).  The issue before us is whether Trueber was in custody when questioned by Pugliesi after the police stopped the truck in which he was riding.

The government argues that what occurred when police officers stopped the truck in which Trueber was riding was a valid Terry stop.  In Terry v. Ohio, the Supreme Court first recognized "that a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest."  392 U.S. 1, 22 (1968).  This authority permits officers to "stop and briefly detain a person for investigative purposes," United States v. Sokolow, 490 U.S. 1, 7 (1989), and "diligently pursue[] a means of investigation . . . likely to

confirm or dispel their suspicions quickly."  United States v.
Sharpe, 470 U.S. 675, 686 (1985).

"As a general rule, Terry stops do not implicate the
requirements of Miranda because 'Terry stops, though
inherently somewhat coercive, do not usually involve the type
of police dominated or compelling atmosphere which
necessitates Miranda warnings.'" United States v. Streifel,
781 F.2d 953, 958 (1st Cir. 1986), quoting United States v.
Bautista, 684 F.2d 1286, 1291 (9th Cir. 1982).  In Berkemer v.
McCarty, the Supreme Court held that routine traffic stops are
more analogous to a Terry stop than to a formal arrest and,
therefore, are not custodial for purposes of Miranda.  468
U.S. 420, 440 (1984) ("The comparatively nonthreatening
character of detentions of this sort explains the absence of
any suggestion in our opinions that Terry stops are subject to
the dictates of Miranda.").

In evaluating the reasonableness of the
investigatory Terry stop in the instant case, we first
determine "'whether the officer['s] actions were justified at
[their] inception,' and if so, 'whether the actions undertaken
by the officer[s] following the stop were reasonably
responsive to the circumstances justifying the stop in the
first place as augmented by information gleaned by the

-31-

officer[s] during the stop." Owens, 167 F.3d at 748 (alterations in original), quoting United States v. Sowers, 136 F.3d 24, 27 (1st Cir. 1998); see also Terry, 392 U.S. at 20.

There is no dispute about the propriety of the initial stop of the truck. The district court correctly stated that the agents "[had] every right to stop [the truck]." However, the district court added: "In fact, [because] I'm positive they may have every right to arrest him, he ought to have gotten his Miranda warnings right then." Further, the district court conjectured that, from the inception of the stop, the agents were not going to "let [Trueber] go anywhere."

Evidently, the district court took the view that because the agents were entitled to arrest Trueber and, thus, necessarily intended to arrest him, what occurred when the officers stopped the truck was not a valid Terry stop, but a de facto arrest, requiring Miranda warnings from the outset. This reasoning improperly conflates the two areas of the inquiry and is based upon a false premise. The subjective intent of the agents is not relevant to either part of the inquiry: it does not impact the validity of the initial investigative stop, and it has no bearing on determining

-32-

whether police conduct transformed an investigative stop into a de facto arrest. See Berkemer, 468 U.S. at 442 ("A policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time."); Streifel, 781 F.2d at 959 (officers' intentions relevant only to the extent that they were communicated to the defendants). Because there is no dispute that the agents had at least an articulable and reasonable suspicion that Trueber was engaged in criminal activity, effecting a limited investigative Terry stop was justified. See United States v. Sharpe, 470 U.S. at 682. Thus, without administering Miranda warnings, the agents were entitled to stop the truck, detain its occupants, and pursue a means of investigation that was likely to confirm or dispel their suspicions quickly. See id. at 686.

Determining that an investigative Terry stop was justified at its inception is only the first step, however. "'The manner in which the seizure and search were conducted is, of course, as vital a part of the inquiry as whether they were warranted at all.'" Streifel, 781 F.2d at 958 (internal citations omitted). The central issue in this case is whether an otherwise valid Terry stop escalated into a de facto arrest necessitating the administration of Miranda warnings. As the Supreme Court stated in Berkemer, the target of a Terry stop

-33-

must be advised of his Miranda rights if and when he is "subjected to restraints comparable to those associated with a formal arrest." 468 U.S. at 441.

"There is no scientifically precise formula that enables courts to distinguish between investigatory stops . . . and . . . 'de facto arrests'." United States v. Zapata, 18 F.3d 971, 975 (1st Cir. 1994). The "ultimate inquiry," however, is whether there was "a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." Thompson v. Keohane, 516 U.S. 99, 112 (1995) (internal quotations and citations omitted). In assessing whether there was a "restraint on freedom of movement," "a court must examine all the circumstances surrounding the interrogation." Ventura, 85 F.3d at 711 (internal quotations and citation omitted). This is an objective test: "the only relevant inquiry is 'how a reasonable man in the suspect's shoes would have understood his situation.' The subjective beliefs held by the interrogating officer or the person being interrogated are not germane." Id., quoting Stansbury v. California, 511 U.S. 318, 324 (1994). Thus, to the extent that the district court based its conclusion that Trueber was in custody on the presumed and uncommunicated intent of the agents to prevent Trueber from leaving the scene, it was in

error.  See Streifel, 781 F.2d at 959.

Relevant circumstances include, among other inquiries, "whether the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the interrogation." Ventura, 85 F.3d at 711 (internal quotation and citation omitted); see also Streifel, 781 F.2d at 961 n. 13.

Determining what constitutes custody thus requires "[t]wo discrete inquiries." Keohane, 516 U.S. at 112.  First, a court must determine what were the circumstances surrounding the exchange between the government agent and the suspect. This inquiry is distinctly factual.  Keohane, 516 U.S. at 112. Second, given those circumstances, a court must determine:

> whether and when a reasonable person in
> [Trueber's] position would have believed
> that he was actually in police custody and
> being constrained to a degree associated
> with formal arrest (rather than simply
> undergoing a brief period of detention at
> the scene while the police sought by means
> of a moderate number of questions to
> determine his identity and to obtain
> information confirming or dispelling their
> suspicions).

Streifel, 781 F.2d at 962.  This ultimate determination turns on an assessment of the aforementioned factors, id. at 961,

and "qualif[ies] for independent review" as it is it presents a "mixed question of law and fact." Keohane, 516 U.S. at 113.

In the instant case, the district court's custody determination was cursory, providing no indication that the court properly applied the correct legal test or recognized that whether and when the stop at issue became custodial turns on the relevant factors mentioned earlier. The district court evidently believed that the circumstances surrounding the detention of Trueber were tantamount to those of a formal arrest from the moment Pugliesi patted down Trueber after stopping the truck and asking the driver and Trueber to step out of the vehicle. This was error. Nothing in the initial stop and detention exceeded the bounds of an ordinary, permissible Terry stop. See United States v. Taylor, 162 F.3d 12, 22 (1st Cir. 1998); Zapata, 18 F.3d at 975.

The one arguably coercive fact – that Pugliesi had his gun drawn and at his side when he asked Trueber to step out of the vehicle – is not sufficient, under the circumstances, to convert the investigatory stop into a de facto arrest. See Taylor, 162 F.3d at 21 (holding that a valid Terry stop did not mature into a de facto arrest when police cruisers stopped a car, blocked it, and two officers drew their weapons when approaching the car); United States v.

Trullo, 809 F.2d 108, 113 (1st Cir. 1987) (holding that police officer's use of drawn weapon did not convert investigative stop into arrest). Pugliesi's drawing of his gun was reasonably related in scope to the circumstances which justified stopping the truck in the first place. The agents suspected Trueber of dealing in narcotics, "a pattern of criminal conduct rife with deadly weapons," id.; the agents' reasonable suspicion justified the stop; the stop occurred at night; Pugliesi testified that he only drew his gun out of concern for his own safety, that he kept it at his side, pointed at the ground, and that he quickly re-holstered it; and there is no evidence in the record that Trueber saw the briefly drawn gun. Such minimal use of a gun, under the circumstances, does not exceed the bounds of a permissible Terry stop.

At this point in the encounter – following the initial stop of the truck and brief pat-down – a reasonable person would have believed only that he was being detained for investigation, not placed under arrest. See Taylor, 162 F.3d at 22. Moreover, at no time during the exchange that followed between Pugliesi and Trueber was Trueber subject to a "restraint on freedom of movement of the degree associated with a formal arrest." Keohane, 516 U.S. at 112 (internal

quotations and citation omitted).  First, the encounter
occurred in neutral surroundings – on a public street.
Second, while five government agents were present at the
scene, no more than two were in direct proximity to Trueber,
each in plain clothes, and only one questioned him.  Further,
"[m]ere numbers do not automatically convert a lawful Terry
stop into something more forbidding."  Zapata, 18 F.3d at 976.
Third, the officers made no threats, brandished no weapons
(other than the brief use by Pugliesi), and exerted no
physical restraint upon Trueber's person beyond the limited
pat-down Pugliesi conducted immediately after Trueber stepped
out of the car.  Finally, the encounter lasted no more than
fifteen minutes, the agents conducted an investigation that
was "likely to confirm or dispel their suspicions quickly,"
and their approach was measured and their conduct not
bellicose.  Sharpe, 470 U.S. at 686 (holding that twenty-
minute investigatory detention was  reasonable where police
"diligently pursued a means of investigation that was likely
to confirm or dispel their suspicions quickly"); Owens, 167
F.3d at 749 (holding that fifty-minute detention not a de
facto arrest when, under the circumstances, officers
diligently pursued a means of investigation that would dispel
their suspicions).  Pugliesi's questioning was brief and to

-38-

the point – his questions were targeted at ascertaining Trueber's identity, his reasons for being in the country, and whether he was involved in the suspected illegal activity – and his search of Trueber's suitcase was by consent. Further, "information gleaned by [Pugliesi] during the stop," id. at 748, including Trueber's inconsistent answers and the suspicious contents of the suitcase, warranted a thorough, rather than cursory, investigation. See Quinn, 815 F.2d at 158 (stating that it would have been unreasonable for officers with very strong grounds for suspicion – approaching probable cause – to have sent suspects on their way after a few perfunctory questions, especially since divergent answers raised the level of suspicion, inviting further inquiry).

Based on the facts accepted by the district court, which are not clearly erroneous, we do not accept Trueber's allegations that the police cruiser blocked the truck after stopping it, that the police officers physically removed the driver from the truck, that Customs agents and police officers surrounded Trueber "with guns displayed," and that Pugliesi searched Trueber's suitcase without consent. While Pugliesi did testify that the police officers briefly placed the driver "either on his knees or flat on his belly" after instructing him to step out of the car, this fact is not relevant to the

inquiry whether a reasonable person in Trueber's position would have believed that he was "actually in police custody and being constrained to a degree associated with formal arrest." Streifel, 781 F.2d at 962.

Therefore, we hold that the course of action pursued by Pugliesi and the other agents and police officers during the investigatory stop was "justified at its inception," and "reasonably related in scope to the circumstances which justified the interference in the first place." Sharpe, 470 U.S. at 682 (internal quotation and citation omitted). What occurred was thus a permissible Terry stop. The situation was not such that a reasonable person would have thought he was under arrest, rather than "simply undergoing a brief period of detention at the scene while the police sought by means of a moderate number of questions to determine his identity and to obtain information confirming or dispelling their suspicions." Streifel, 781 F.2d at 962. Nothing the agents did or said sufficed to convert the investigatory stop into an arrest requiring the administration of Miranda warnings. Therefore, we reverse the district court's suppression of all statements made by Trueber during the course of the valid investigatory Terry stop of the truck.

B.

Next, the government contends that the district court erred in suppressing statements made by Trueber in his hotel room subsequent to the roadside encounter.  The district court concluded that the hotel room search and interrogation were non-consensual and that Trueber was in custody once the agents entered the room and told Trueber to sit down.  The government argues that Trueber voluntarily consented to allow the agents into his room to search his luggage and resume questioning after the roadside encounter.

Because the district court determined that Trueber was in custody when he agreed to accompany the agents back to his hotel room, it treated the issue of consent in a per se manner: any consent on Trueber's part necessarily was involuntary because he was in custody.  This per se rule is invalid.  While  "sensitivity to the heightened possibility of coercion is appropriate when a defendant's consent is obtained during custody, custody alone has never been enough in itself to demonstrate . . . coerced . . . consent to search."  United States v. Collazo-Aponte, 216 F.3d 163, 187 (1st Cir. 2000) (internal quotations and citations omitted) (omissions in original).  But more important, for the reasons stated earlier, Trueber was not in custody when he gave his consent.

The question of voluntariness is a question of fact

determined by the totality of the circumstances.  Id.
"Voluntariness turns on a number of factors, including the
person's 'age, education, experience, intelligence, and
knowledge of the right to withhold consent.'"  United States
v. Coraine, 198 F.3d 306, 309 (1st Cir. 1999), quoting United
States v. Barnett, 989 F.2d 546, 555 (1st Cir. 1993).

Due to its erroneous initial custody determination
based upon the facts accepted, the district court did not
fully address the issue of consent.  It now must do so,
bearing in mind our determination that Trueber was not in
custody at the time Pugliesi requested to search his hotel
room and interrogate him further.

Moreover, after determining the issue of consent,
the district court must apply the proper legal test discussed
earlier and reevaluate whether and when the hotel room
encounter was custodial for purposes of Miranda.  In sum, the
central custody inquiry is whether there was a "restraint on
freedom of movement of the degree associated with a formal
arrest,"  Keohane, 516 U.S. at 112 (internal quotation and
citation omitted), and the ultimate determination turns on an
examination of the same factors mentioned earlier.

We vacate the district court's suppression of the
statements made in the hotel room and remand to the district

court for determination of the issue of consent to search the hotel room and for application of the correct legal test for determining custody while in the hotel room.  On remand, the district court may take additional evidence on the relevant factual issues.

<u>Reversed in part, vacated in part, and remanded</u>.