**UNITED STATES of America**

v.

**Thomas LANDRY**

**No. CR. 03–10072–RCL.**

United States District Court,
D. Massachusetts.

Nov. 22, 2004.

Michael J. Pelgro, United States Attorney's Office, John A. Wortmann, Jr., United States Attorney's Office, Boston, MA, for Plaintiff.

Thomas J. Butters, Butters, Brazilian & Small, Anthony M. Cardinale, Cardinale & DiMauro, LLC, Boston, MA, Neil F. Colleran, Borrelli, Colleran & Williams, PC, Belmont, MA, Randolph M. Gioia, Law Office Of Randolph Gioia, Robert M. Goldstein, George F. Gormley, Boston, MA, Martin K. Leppo, Leppo & Leppo, Randolph, MA, John C. McBride, McBride and Natola, Martin F. Murphy, Bingham McCutchen LLP, Pretrial Services, U.S. Pretrial Services, Matthew D. Thompson, Butters, Brazilian & Small LLP, Boston, Timothy G. Watkins, Federal Defender's Office, District of Massachusetts, Boston, MA, for Defendants.

## MEMORANDUM AND ORDER ON MOTION TO SUPPRESS STATEMENTS

LINDSAY, District Judge.

Before the court is a motion of defendant Thomas Landry ("Landry") to suppress certain statements he made to the law enforcement officers on February 6, 2003. An evidentiary hearing, including argument, was held, on November 15, 2004.

To the extent that the motion is based on a claim that the statements at issue were not made after a knowing, voluntary, and intelligent waiver by Landry of his rights under *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the motion is denied. The reasons for this ruling were stated on the record at the time of the hearing. This memorandum and order, therefore, addresses that part of the motion based on Landry's claim that his *Miranda* warnings were not timely given.

### I. Background Facts

Landry was indicted for conspiracy to collect credit by extortionate means, in violation of 18 U.S.C. § 894. The government alleged that on or about December 9, 2002, Landry threatened and beat one Sean Lee, an Oxycontin dealer who owed money to one or more of Landry's co-defendants. The conduct for which Landry has been indicted allegedly occurred in the parking lot of a restaurant in Billerica, MA. In the statements that are the subject of this motion, Landry admitted both his involvement in the beating and having been paid $1,000 for his participation in the alleged extortion of Lee.

### II. Findings of Fact and Rulings of Law

The question before me is whether Landry was advised of his rights under *Miranda* before he made certain statements that incriminated him in the offense alleged in the indictment. The government contends that no questioning of Landry took place until his rights were explained to him orally and he had read and signed a

waiver of those rights.[1] Landry claims that some questioning of him occurred, and he made inculpatory statements, before any explanation of his rights was given.

The following facts are not in dispute. Landry was arrested on February 6, 2003 at his residence, a 12–step program sobriety house, located at 317 Boston Road in Billerica, MA. At approximately 3:40 p.m., Massachusetts State Police Sergeant Mark Marron ("Marron") and four other officers, including Billerica Police Detective George Galinos ("Galinos"), went to 317 Boston Road with a warrant for Landry's arrest. The officers were in plain clothes, but their badges were conspicuously displayed. On arrival, the officers identified themselves to the building manager and told him that they were looking for Landry. The manager showed the officers to Landry's room. Galinos went into Landry's room first, and found Landry lying in bed with his eyes closed. Landry was the only person in the room, which had three other beds. Galinos called to Landry, introduced himself, and said that some people wanted to speak with Landry.

The parties dispute what happened next. Based on my assessment of the evidence produced at the hearing, I make the following findings.

At least three or four of the five officers entered Landry's room.[2] Landry was in bed, wearing only a T-shirt and a pair of shorts. The officers positioned themselves near Landry's bed, and he was questioned primarily by Marron. Landry was not initially advised of his *Miranda* rights and made incriminating statements before those rights were explained to him.

After talking to the officers for approximately five minutes, Landry asked if the officers had a warrant for his arrest. Marron responded that he did have such a warrant. He then recited to Landry his *Miranda* warnings and handed Landry the *Miranda* waiver form. The waiver form contained a fuller explanation of the *Miranda* warnings than that Marron had given to Landry orally. Thereafter, Marron asked Landry if he understood his rights, and Landry acknowledged that he did. Marron then asked if Landry wished to waive his rights and answer some questions. Landry answered in the affirmative, signed the waiver form, and continued his conversation with the officers. He was not searched, handcuffed, or otherwise restrained during the conversation. The officers did not display weapons or threaten Landry in any way. The officers treated Landry in a calm and polite manner throughout the questioning. After questioning Landry for about five minutes, the officers placed him under arrest and transported him to the Billerica police station for booking.

Landry claims that, based on the objective circumstances of the interrogation, a reasonable person in his position would have understood the situation to be the equivalent of formal custody. Accordingly, Landry insists that any statements he made to the police before being given the *Miranda* warnings were obtained illegally and must be suppressed.

■ The *Miranda* warnings are required once a person is subjected to custodial interrogation. *Stansbury v. California*, 511 U.S. 318, 322, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994); *United States v. Quinn*, 815 F.2d 153, 160 (1st Cir.1987).

---

1. The waiver form set forth the *Miranda* warnings.

2. Throughout part of the questioning, at least one of the other officers remained in the hallway outside, or at the doorway to, Landry's room.

In assessing whether the defendant was in custody, a court must first "determine what were the circumstances surrounding the exchange between the government agent[s] and the suspect. This inquiry is distinctly factual." *United States v. Trueber*, 238 F.3d 79, 93 (1st Cir.2001). Next, given those circumstances, a court must determine "whether and when a reasonable person in [the defendant's] position would have believed that he was actually in police custody and being constrained to a degree associated with formal arrest." *Id.* (quoting *United States v. Streifel*, 781 F.2d 953, 962 (1st Cir.1986)); *United States v. Nishnianidze*, 342 F.3d 6, 13 (1st Cir. 2003); *see Commonwealth v. Larkin*, 429 Mass. 426, 432, 708 N.E.2d 674 (1999) (explaining that the test of custody is objective: "whether a reasonable person in the suspect's shoes would experience the environment in which the interrogation took place as coercive").

■ In making its custody determination, a court should consider "whether the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the interrogation." [3] *Nishnianidze*, 342 F.3d at 13 (quoting *United States v. Masse*, 816 F.2d 805, 809 (1st Cir.1987)); *see Trueber*, 238 F.3d at 94–95 (no custody during a *Terry* investigative stop that lasted no more than fifteen minutes, took place in neutral surroundings, involved no more than two of five officers in direct proximity to the suspect, and during which the officers used no threats or physical restraints); *see Masse*, 816 F.2d at 809–10 (no custody where the agents approached the defendant on a public sidewalk in the afternoon, the agents were not in uniform, they identified themselves immediately upon approaching the defendant and did not engage in or threaten physical coercion, and the interrogation was brief). The officers' subjective intent, such as the intent to arrest the suspect at some point, if undisclosed, is irrelevant to the custody determination. *Stansbury*, 511 U.S. at 319, 323, 114 S.Ct. 1526; *Trueber*, 238 F.3d at 92.

If the accused is questioned in familiar surroundings, courts are especially reluctant to find custody. *United States v. Lanni*, 951 F.2d 440, 441–443 (1st Cir. 1991) (no custody where the defendant was interviewed by two agents in hew own home for four hours, and asked to provide many handwriting samples in a "tense" atmosphere); *see United States v. Axsom*, 289 F.3d 496, 501–03 (8th Cir.2002) (no custody even though the defendant was not allowed to move around at will, where the defendant was told he was not under arrest, was questioned inside his home, was not handcuffed, smoked his pipe while sitting in an easy chair, and appeared friendly and cooperative); *United States v.*

---

**3.** In *United States v. Axsom*, 289 F.3d 496 (8th Cir.2002), the court outlined the following factors, tending either to mitigate (factors (1)-(3)) or aggravate (factors (4)-(6)) the atmosphere of custodial interrogation: "(1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntary acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning." *Axsom*, 289 F.3d at 500 (quoting *United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir.1990)).

*White*, 270 F.3d 356, 366 (6th Cir.2001) (*Miranda* warnings not required where the defendant consented to the interview in her home, was not handcuffed or physically restrained, and where the agents "made no suggestion that [the defendant] was not free to leave"); *United States v. Parker*, 262 F.3d 415, 419 (4th Cir.2001) (*Miranda* warnings not required, because the defendant was not handcuffed, was questioned in her own bedroom, and was told she was not under arrest; additionally, a relative was permitted to enter and exit the room twice during the questioning); *United States v. Rith*, 164 F.3d 1323, 1332 (10th Cir.1999) (*Miranda* warnings not required where the defendant was questioned in his own home and told to sit at a table and answer the questions); *United States v. Mitchell*, 966 F.2d 92, 98–99 (2d Cir.1992) (*Miranda* warnings not required where the interview occurred in the defendants' home, and no verbal threats or intimidating gestures were directed at the defendants). *But see Orozco v. Texas*, 394 U.S. 324, 325–27, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969) (*Miranda* warnings required where several officers questioned the defendant in his bedroom at 4 a.m.).

■ Based on my assessment of the facts, I conclude that Landry was not in custody until he asked for—and was told that the officers had—an arrest warrant for him, was given his *Miranda* warnings both orally and in writing, and signed the waiver form. Although three or four of the five officers were in his room throughout the questioning, "[m]ere numbers do not automatically" create custody. *See Trueber*, 238 F.3d at 94. Like the defendants in *Rith* and *Mitchell*, Landry was questioned at his residence, the officers "had authority to be there[, and] did not draw their weapons, handcuff [Landry], or otherwise impose physical restraints upon

him." *Rith*, 164 F.3d at 1332; *see Mitchell*, 966 F.2d at 99. *Contrast Combs v. Coyle*, 205 F.3d 269, 284–85 (6th Cir.2000) (custody where officer pointed his weapon at a suspect on the ground, ordered the suspect to drop his weapon, and kept suspect on the ground for 10 minutes before questioning him). As in *Rith*, the officers' questions were neither harassing nor especially prolonged. *Rith*, 164 F.3d at 1332. The officers questioned Landry for no more than about five minutes before reading him his *Miranda* warnings. *See Trueber*, 238 F.3d at 94. According to Landry, the officers were courteous and polite; Galinos even engaged Landry in friendly conversation concerning Landry's employment.

Furthermore, unlike in *Orozco*, the officers entered Landry's room in the middle of the day. Most, if not all, of the questioning was done by one person, Marron. *Trueber*, 238 F.3d at 94 (no custody where "the encounter occurred in neutral surroundings, [and,] while five government agents were present at the scene, no more than two were in direct proximity to [the defendant], each in plain clothes, and only one questioned [the defendant]").

Overall, "[n]one of these factors, alone or aggregated, ... overcomes [the] conclusion that a reasonable person in [Landry's] position would have felt free to leave." *Rith*, 164 F.3d at 1332. When asked whether he thought he was free to leave the questioning, Landry replied: "Nobody said anything, but I didn't think it was the right thing to do ... to get up and try to walk away when people were asking me questions." I interpret this answer to express a concern about courtesy, not custody. Moreover, Landry testified: "The truth of the matter is ... I did not understand I was under arrest." Of course, the standard is an objective one, *Stansbury*, 511 U.S. at 323, 114 S.Ct. 1526 ("[t]he

initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned"), but Landry's expression of his subjective feeling sheds light on the objective circumstances confronting him at the time.

I conclude therefore that, during the initial questioning of Landry, "the officers' presence, conduct, and questioning did not rise to the level of a restraint of freedom of movement of the degree associated with a formal arrest." *Rith*, 164 F.3d at 1332. Landry was not in custody until he asked whether the officers had an arrest warrant for him, was told that they did, was given his *Miranda* warnings both orally and in writing, and he signed the waiver form. Because he was not in custody before that time, there is no reason to suppress Landry's pre-*Miranda* statements. Furthermore, because "no reason exist[s] to suppress [Landry's] first set of statements, there [i]s no primary illegality to taint his subsequent statements." *Masse*, 816 F.2d at 810.

### Conclusion

For the foregoing reasons, Landry's motion to suppress the statements he made to the police on February 6, 2003 is DENIED.

SO ORDERED.