# United States Court of Appeals
## For the First Circuit

No. 04-1846

UNITED STATES OF AMERICA,

Appellee,

v.

JESUS ROJAS-TAPIA,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Juan M. Pérez-Giménez, U.S. District Judge]

Before

Boudin, Chief Judge,

Cyr, Senior Circuit Judge,

and Lynch, Circuit Judge.

Raúl S. Mariani-Franco for appellant.
Thomas F. Klumper, Assistant United States Attorney, with whom
H.S. Garcia, United States Attorney, and Nelson Pérez-Sosa,
Assistant United States Attorney, were on brief for appellee.

April 11, 2006

**CYR, <u>Senior Circuit Judge</u>.** Jesus Rojas-Tapia appeals the conviction and sentence resulting from his participation in a conspiracy to commit airline piracy and his use of a semiautomatic firearm, contending that (i) the district court erred in denying his motion to suppress the inculpatory post-arrest statements he made to the police, and (ii) we must vacate the ensuing Guidelines sentence and remand for resentencing under the new "advisory" Guidelines regime prescribed in <u>United States</u> v. <u>Booker</u>, 543 U.S. 220 (2005). We affirm.

**I**

**<u>BACKGROUND</u>**

On December 30, 2002, Rojas-Tapia and an associate hijacked a rented helicopter and forced the pilot, at gunpoint and on threat of death, to fly them to the state penitentiary in Ponce, Puerto Rico, where five inmates were waiting on the penitentiary's roof, one of whom was the defendant's brother, Jose. After the helicopter departed the penitentiary, it dropped all seven men in a rural area, where the defendants went into hiding. Following a massive police hunt, the defendant, his brother, and one of the prison escapees were arrested on January 2, 2003. All three were in possession of firearms. The police advised defendant of his <u>Miranda</u> rights, then transported him by police car to police headquarters. Several hours into this detention, while police were asking routine booking questions, Rojas-Tapia abruptly stated that

-2-

he wanted to tell them about his participation in the hijacking. Although the police reminded Rojas-Tapia that he had the right to counsel and to remain silent, he proceeded to make a detailed inculpatory statement.

In due course, defendant and his associates were indicted on one count each of conspiring to commit aircraft piracy, 49 U.S.C. § 46502(a)(1), armed aircraft piracy, id., and use of a semiautomatic weapon during or in relation to a crime of violence, 18 U.S.C. § 924(c)(1). Defendant subsequently submitted a motion to determine his mental competency to stand trial. Following a hearing and a review of the Federal Detention Center (FDC) psychologist's evaluation, the district court found the defendant competent to stand trial.

Defendant also submitted a motion to suppress his post-arrest statement in which he had admitted participation in the planning and hijacking of the helicopter. The motion stated that the government could not demonstrate that his waiver of his Miranda rights had been knowing and voluntary, since the FDC psychologist concluded that the defendant had but a borderline intellectual capacity, hence could not have understood his legal rights or the consequences of their waiver. At an evidentiary hearing conducted on the suppression motion during the jury trial, Rojas-Tapia, orally and for the first time, raised another ground for the motion to suppress: that the police had coerced his statements by

depriving him of food for approximately eight hours following his arrest. The district court denied the suppression motion, then admitted the Rojas-Tapia confession.

Following a seven-day trial, the jury convicted the defendant on all three counts. The district court thereafter imposed concurrent 365-month terms of imprisonment under Counts 1 and 2, as well as a term of 84 months on Count 3, to be served consecutively to the sentences imposed under Count 1 and Count 2. Defendant now appeals from his conviction, challenging the denial of his suppression motion, and from his sentence, arguing that the intervening Booker decision, which held that the Guidelines are advisory rather than mandatory, requires a remand for resentencing.

## II

## DISCUSSION

### A.    The Motion to Suppress

The defendant contends that the district court erred in denying his motion to suppress the incriminating statements made to the police following his arrest, in that the government failed to establish that he knowingly and voluntarily waived his Miranda rights. Specifically, he asserts that the record evidence demonstrates that he lacked an adequate level of intellectual functioning and comprehension, and that the police coercively withheld food from him for up to eight hours following his arrest.

## 1.  The Standard of Review

We review the denial of a motion to suppress under a bifurcated standard.  With respect to determinations on matters of law, including whether the totality of the attendant circumstances demonstrate that the defendant's statement was knowing and voluntary, we review de novo, whereas subsidiary findings of fact are reviewed for clear error.  See United States v. Marenghi, 109 F.3d 28, 31-32 (1st Cir. 1997).

## 2.  The Alleged Post-Arrest Deprivation of Food

It is undisputed that the police administered the Miranda warnings – including the right to refrain from self-incrimination – on several occasions following Rojas-Tapia's January 2 arrest, both verbally and in writing, and that Rojas-Tapia told police that he understood the warnings.  Thus, the sole question on appeal is whether Rojas-Tapia waived his Miranda rights.

A waiver of Miranda rights must be "voluntary" and "knowing":

> [T]he relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. . . . [T]he waiver [also] must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.  Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.

-5-

<u>Moran</u> v. <u>Burbine</u>, 475 U.S. 412, 421 (1986) (citation omitted); <u>see</u> <u>Miranda</u> v. <u>Arizona</u>, 384 U.S. 436, 444 (1966).  After assessing the totality of the circumstances attending a defendant's confession, <u>see</u>, <u>e.g.</u>, 18 U.S.C. § 3501(b),[1] we will affirm the denial of a motion to suppress provided the government proved, by a mere preponderance of the evidence, that there was a valid waiver.  <u>See</u> <u>Colorado</u> v. <u>Connelly</u>, 479 U.S. 157, 168 (1986); <u>Lego</u> v. <u>Twomey</u>, 404 U.S. 477, 489 (1972).

First, Rojas-Tapia contends that the government failed to

---

[1]Section 3501(b) provides a nonexclusive list of relevant circumstances:

> The trial judge in determining the issue of voluntariness shall take into consideration all the circumstances surrounding the giving of the confession, including (1) the time elapsing between arrest and arraignment of the defendant making the confession, if it was made after arrest and before arraignment, (2) whether such defendant knew the nature of the offense with which he was charged or of which he was suspected at the time of making the confession, (3) whether or not such defendant was advised or knew that he was not required to make any statement and that any such statement could be used against him, (4) whether or not such defendant had been advised prior to questioning of his right to the assistance of counsel; and (5) whether or not such defendant was without the assistance of counsel when questioned and when giving such confession.  The presence or absence of any of the above-mentioned factors to be taken into consideration by the judge need not be conclusive on the issue of voluntariness of the confession.

18 U.S.C. § 3501(b).

-6-

prove that his confession was "voluntary," because the record evidence demonstrates that the police failed to provide him food for up to eight hours after his arrest.

Among the totality of factors which may be material in determining the voluntariness of a confession is whether law enforcement officials subjected defendant to physically coercive punishment, such as an unreasonable deprivation of food or sleep. See Schneckloth v. Bustamonte, 412 U.S. 218, 220 (1975); United States v. Gillaum, 372 F.3d 848, 856-57 (7th Cir.), cert. denied, 543 U.S. 969 (2004); e.g., Sims v. Georgia, 389 U.S. 404, 407 (1967) (finding confession involuntary where, inter alia, defendant had been in custody for eight hours without food); Brooks v. Florida, 389 U.S. 413, 414-15 (1967) (same, statement obtained after suspect was deprived of adequate food and was detained naked in a small cell); Reck v. Pate, 367 U.S. 433, 441 (1961) (same, statement obtained after depriving suspect of adequate food, sleep, and contact with family); Taylor v. Maddox, 366 F.3d 992, 1015 (9th Cir.) (same, statement by 16-year-old who was interrogated for three hours, and was given no food or water), cert. denied, 543 U.S. 1038 (2004). Plainly, one can envision circumstances in which such deprivations of basic physical necessities would undermine a defendant's will and ability to resist coercive police interrogation.

In the instant case, however, we need not determine in

-7-

what particular circumstances a post-arrest deprivation of food would contribute to the coercion of a confession, since there is no clear error in the district court's determination that the government established, by a preponderance of the evidence, that Rojas-Tapia had been provided with food before his confession. See Marenghi, 109 F.3d at 31-32. The government adduced the eyewitness testimony of Police Agent Richard Rivera Cortes – one of the officers who interviewed Rojas-Tapia the day he was arrested – that Rojas-Tapia had received food prior to volunteering his confession:

> Q:   [Y]ou mentioned also food.
> A:   Yes, sir.
> Q:   Did you saw (sic) with your own eyes anyone giving food to Mr. Rojas-Tapia?
> A:   Yes, sir. Yes, sir, I did.
> Q:   At what time?
> A:   I believe it was four something, four forty five, something like that.
> Q    So, the food was given to Mr. Rojas-Tapia exactly before he was interviewed.  That is your testimony.
> A:   Yes, sir.

Moreover, Agent Cortes testified that, far from being overborne or distressed by hunger, Rojas-Tapia consumed little of the food made available to him.  Cf. United States v. Gamez, 301 F.3d 1138, 1145 (9th Cir. 2002) (noting that defendant "was offered but declined a drink prior to each interrogation," and "never asked for food").[2]

_____

[2]Rivera Cortes repeatedly stated that Rojas-Tapia received food:

> A:   I believe, we approximately arrived about three or four [p.m.], and we were waiting for the arrested individuals who had been arrested at that time to be supplied with medical attention and food.

Rivera Cortes' unequivocal testimony was more than sufficient to satisfy the government's burden of proof. See United States v. Marshall, 348 F.3d 281, 284 (1st Cir. 2003) (observing that we normally defer to the district court's resolution of witness credibility issues arising in connection with a motion to suppress). As Rojas-Tapia did not testify in support of the suppression motion, the record contains no direct evidence to contradict Rivera Cortes' testimony that Rojas-Tapia was provided with food.[3]

　　Rojas-Tapia cites other evidentiary snippets, none of

---

. . . .
```
A:   [W]e had to wait for them to get their food and
     medical attention, sir [before interviewing
     defendants].
```
. . . .
```
Q:   Okay, so the first time you saw Mr. Rojas-Tapia was
     after four P.M.?
A:   Yes, sir.
Q:   Which was more or less the same time you saw him
     eating?
A:   More or less, sir.
```
. . . .
```
Q:   You didn't start your interview until he had
     finished eating?
A:   That is correct sir and if I am not mistaken sir, I
     don't think he really didn't want to eat that day.
Q:   He didn't eat?
A:   If he nibbled the food, because I remember even his
     brother, Rojas-Tapia, couldn't eat.
```

[3]The government bore the burden of proof on the motion to suppress, Connelly, 479 U.S. at 168, and Rojas-Tapia had every right to refrain from testifying, thereby putting the government to its proof. We note Rojas-Tapia's failure to testify only to the extent that his decision not to testify left the government's evidence – viz., Rivera Cortes' testimony – uncontradicted.

which conclusively undermines Rivera Cortes' unequivocal testimony.[4] For example, Police Agent Javier Requena Mercado testified that he could not remember whether or not he saw Rojas receive <u>water</u>. However, a witness's lack of memory normally generates simply a credibility issue for the factfinder, rather than a negative inference (<u>viz.</u>, that Rojas-Tapia received no food) as a matter of law. <u>See</u>, <u>e.g.</u>, <u>Bushkin Assocs., Inc.</u> v. <u>Raytheon Co.</u>, 815 F.2d 142, 149 (1st Cir. 1987). Further, Requena Mercado was never asked whether Rojas-Tapia received <u>food</u>.

FBI Task Force Agent Luis Sosa, who participated in the questioning during which Rojas-Tapia confessed, testified that he had not seen Rojas-Tapia eating:

> Q:   Can you tell me if you, at any time saw Mr. Jesus Rojas-Tapia eating any food in that afternoon, during that afternoon?
> A:   No, I was guarding his brother. He indeed was eating.
> Q:   So, you saw Jose Rojas, Gordy, eating, but you didn't see Mr. Jesus Rojas eating any food?
> A:   Yes.
> . . . .
> Q:   Do you remember more or less at what time did you arrive at the interview room to interview Mr. Jesus

[4]Notably, Rojas-Tapia did not include this "deprivation" argument in his original written motion to suppress, but raised it orally after hearing the testimony presented at the suppression hearing. It is arguable that this constituted a waiver, given that Rojas-Tapia presumably knew at the time he filed his written motion whether he had been deprived of food, and his argument did not depend on the police agents' testimony on this matter. <u>See United States</u> v. <u>Santos Batista</u>, 239 F.3d 16, 20 (1st Cir. 2001) (noting that defendant normally cannot delay filing a motion to suppress unless supportive evidence was a "surprise"). As the district court decided the issue, however, we address it.

```
        Rojas-Tapia?
A:      The exact, not the exact hour, it was in the
        afternoon, because we had to wait for them to eat.
Q:      But the fact is that when you go (sic) to the
        interview room, you didn't see Mr. Rojas-Tapia eat,
        nor you (sic) saw left overs (sic) there in the
        room?
A:      No.
```

The Sosa testimony cannot conclusively establish that Rojas-Tapia received no food, however, given that (i) Sosa conceded that he was not in constant surveillance of the defendant because he was charged with guarding his brother Jose, and (ii) Sosa might have arrived at the interview room only after Rojas-Tapia had finished his meal. The lack of leftovers could suggest either that Rojas-Tapia consumed the entire meal, or that any leftovers had been removed from the room before Sosa's arrival.

Police Agent Borrero Torres was asked: "[D]uring all that time [before noon to 5-6 p.m.] you didn't saw (sic) Mr. Rojas-Tapia eat any food?" Torres replied: "Food, during the time that I was there, no, water." The Borrero Torres testimony did not contradict Rivera Cortes' testimony that he saw Rojas-Tapia eating, however, since the record does not establish that Agent Borrero Torres was constantly in attendance with Rojas-Tapia during the relevant time interval, and it is unlikely that he would have guarded Rojas-Tapia for five or six hours with no break. Finally, Borrero Torres was asked whether "any of the detainees received any food or water?" He replied: "Yes, water, they were given water." As the question was phrased in the disjunctive, however, Borrero

-11-

Torres' answer would have been entirely accurate whether or not Rojas-Tapia had received food as well.

Since the government adduced uncontradicted evidence that Rojas-Tapia received food before his confession, the district court's factual determination that no actionable deprivation occurred cannot have been clearly erroneous. Therefore, this factor need be considered no further in assessing the totality of circumstances attending the Rojas-Tapia confession. See, e.g., United States v. Spruill, 296 F.3d 580, 589 (7th Cir. 2002) ("There is no evidence that [defendant] complained during the day about feeling ill or hungry and he was given food on several occasions.").

### 3. <u>Borderline Intellectual Functionality</u>

As concerns the question whether the waiver of Rojas-Tapia's <u>Miranda</u> rights was "knowing," he primarily cites to the FTC mental evaluation, which states that he had a "[p]oor range of intellectual functioning, rating in the 3rd, 2nd, and 5th percentile in intellectual functioning tests performed on him," and characterizes Rojas-Tapia's intellectual functioning as "[b]orderline," <u>viz.</u>, quantified as an I.Q. ("intelligence quotient") of 71. The report further notes that Rojas-Tapia's "understanding of the legal process should not be assumed," then recommends that Rojas-Tapia be permitted "regularly" to consult with his attorney at trial, and be required "to restate information

in his own words to ensure an adequate level of understanding."

The waiver inquiry ultimately turns not upon any one factor, but upon all the attendant circumstances, see Arizona v. Fulminante, 499 U.S. 279, 285 (1991), including "both the characteristics of the accused and the details of the interrogation," Schneckloth, 412 U.S. at 226; see United States v. Faulkingham, 295 F.3d 85, 90 (1st Cir. 2002), cert. denied, 542 U.S. 953 (2004). More particularly, the fact that Rojas-Tapia has a relatively low I.Q., standing alone, is not dispositive of the waiver determination. A defendant's mental state or condition, by itself and apart from its relationship to official coercion, is never dispositive of the inquiry into constitutional voluntariness. See Connelly, 479 U.S. at 164; United States v. Palmer, 203 F.3d 55, 61-62 (1st Cir. 2000). Rather, "[t]he voluntariness of a waiver of this privilege has always depended on the absence of police overreaching, not on 'free choice' in any broader sense of the word." Connelly, 479 U.S. at 170.

For several reasons, the evidence Rojas-Tapia cites from the FTC evaluation is insufficient to render his statements either unknowing or involuntary. The FTC evaluation contains other language which suggests that Rojas-Tapia's lack of mental acuity is far less dire. For instance, it concludes that he was free of any debilitating mental illness, and had sufficient comprehension to render him competent to stand trial. See United States v. Muriel-

-13-

Cruz, 412 F.3d 9, 13 (1st Cir. 2005) (noting that, to be found competent to stand trial, "'a defendant must be able to understand the proceedings against him and have sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding.'") (emphasis deleted; citation omitted). Further, the FTC evaluation concluded that Rojas-Tapias functioned within normal range in important areas which implicate the circumstances of Rojas-Tapia's confession, such as orientation, language comprehension, naming ability, memory, abstract reasoning and judgment.

Law enforcement officers credibly testified that the Rojas-Tapia confession was lucid and articulate, see United States v. Solis, 299 F.3d 420, 439-40 (5th Cir. 2002) (noting that observations as to defendant's demeanor and articulateness during a confession are evidence relevant to whether confession was knowing and voluntary), and that he volunteered during the routine booking interview that he wanted to make the statements, even after the officers once again reminded him that he was entitled to remain silent and/or request the presence of an attorney, see United States v. Duarte, 160 F.3d 80, 81-82 (1st Cir. 1998) (finding no coercion where defendant confessed during a routine, low-pressure booking interview). More importantly, Rojas-Tapia cites no other record evidence of police coercive tactics – besides his failed allegation that he was deprived of food, see supra – which might

-14-

lead us to infer that the police intentionally preyed upon his alleged intellectual deficiencies.  See Connelly, 479 U.S. at 170.

Finally, as the district court aptly noted, Rojas-Tapia was hardly a neophyte in the criminal justice system, but had an extensive prior record (viz., Criminal History Category III, including convictions for attempted armed robbery in 1992 and 1994).  Thus, the district court reasonably believed that, whatever the deficiencies in his intellectual functioning, Rojas-Tapia's repeated earlier exposure to Miranda warnings made it extremely unlikely that he failed to understand his rights at the time he made these incriminating statements.  See Palmer, 203 F.3d at 61 (observing that sixteen prior arrests constituted competent evidence of adequate comprehension); see also United States v. Glover, 431 F.3d 744, 748 (11th Cir. 2005); United States v. Pruden, 398 F.3d 241, 246 (3d Cir. 2005); Taylor, 366 F.3d at 1015; United States v. Morris, 247 F.3d 1080, 1090 (10th Cir. 2001); Correll v. Thompson, 63 F.3d 1279, 1288 (4th Cir. 1995).  Indeed, it is in this context that the FTC mental evaluation – that Rojas-Tapia possessed normal capacities for memory and judgment – is the most telling.

Given these factors, we conclude that even assuming the medical evidence of Rojas-Tapia's intellectual limitations – specifically, relatively low I.Q. – were to be credited, those limitations did not result in a confession which was other than

-15-

"knowing" in the constitutional sense.   See, e.g., Clark v. Mitchell, 425 F.3d 270, 283 (6th Cir. 2005) ("The inquiry is not whether 'a criminal suspect know[s] and understand[s] every possible consequence of a waiver of the Fifth Amendment privilege.' That [defendant] had borderline retardation (in the words of Dr. Kisin) or 'low average intellect' (in the words of Dr. Gelbort) is not dispositive.  Our sister circuits have found several instances where defendants, despite their mental retardation or low I.Q.'s, were found to have waived their rights knowingly and intelligently.") (citations omitted); United States v. Turner, 157 F.3d 552, 555 (8th Cir. 1998) (holding that defendant's borderline I.Q. did not prevent a knowing and intelligent waiver); Rice v. Cooper, 148 F.3d 747, 750-51 (7th Cir. 1998) (holding that mildly retarded defendant gave a valid waiver because police had no reason to suspect that he did not understand the warnings); Correll, 63 F.3d at 1288 (finding confession by defendant with an I.Q. of 68 knowing and voluntary where he had received Miranda warnings in the past); Winfrey v. Wyrick, 836 F.2d 406, 411 (8th Cir. 1987) ("The primary facts suggesting coercion are [defendant's] age and low IQ. Yet, in past cases this court considered facts similar to these and held that confessions were voluntary.").

As neither ground for the Rojas-Tapia suppression motion

had merit, we affirm the denial of the motion.[5]

## B.    <u>The Booker Sentencing Remand</u>

Rojas-Tapia contends that we must remand for resentencing in light of <u>United States</u> v. <u>Booker</u>, 543 U.S. 220 (2005), wherein the Court held that the Sentencing Guidelines were merely advisory, rather than mandatory.  <u>Id.</u> at 245-46.  As Rojas-Tapia did not preserve the <u>Booker</u> error, however, he bears the burden on appeal to point to circumstances creating a reasonable probability that the district court would impose a different sentence more favorable to the defendant under the new advisory Guidelines' <u>Booker</u> regime. <u>See</u> <u>United States</u> v. <u>Baskin</u>, 424 F.3d 1, 4 (1st Cir. 2005); <u>United States</u> v. <u>Antonakopoulos</u>, 399 F.3d 68, 75 (1st Cir. 2005).

Rojas-Tapia bases the remand request on the contention that the district court felt compelled to deny him a departure for

---

[5]Although we need not reach the issue, we note that the government makes a persuasive argument that the admission of Rojas-Tapia's confession, even if it had violated his rights, nonetheless would be considered harmless, given other independent record evidence of his complicity in the helicopter hijacking.

-17-

"diminished capacity," see U.S.S.G. § 5K2.13,[6] specifically caused by his borderline intellectual functioning and troubled family history. The record belies his contention.  The district court stated:

> Although . . . there is some information that would indicate that the court could be lenient with him in view of his background insofar as drug abuse and dysfunctional family atmosphere, nevertheless the drug abuse is self induced and [he has] his previous contacts with the law . . . . The defendant's request for a downward departure pursuant to [§ 5K2.13], that is the guideline for diminished capacity, is hereby denied. . . . Based on all the available information, including the forensic evaluation prepared by

---

[6]Section 5K2.13 provides:

A downward departure may be warranted if (1) the defendant committed the offense while suffering from a significantly reduced mental capacity; and (2) the significantly reduced mental capacity contributed substantially to the commission of the offense. Similarly, if a departure is warranted under this policy statement, the extent of the departure should reflect the extent to which the reduced mental capacity contributed to the commission of the offense.

However, the court may not depart below the applicable guideline range if (1) the significantly reduced mental capacity was caused by the voluntary use of drugs or other intoxicants; (2) the facts and circumstances of the defendant's offense indicate a need to protect the public because the offense involved actual violence or a serious threat of violence; (3) the defendant's criminal history indicates a need to incarcerate the defendant to protect the public; or (4) the defendant has been convicted of an offense under chapter 71, 109A, 110, or 117, of title 18, United States Code.

U.S.S.G. 5K2.13.

> the United States Bureau of Prisons, all this
> evidence does not support the defendant's
> position. Furthermore, the subject policy
> statement of the guideline goes on to prohibit
> such a departure if the significantly reduced
> mental capacity was caused by the voluntary
> use of drugs and other intoxicants, [and] the
> facts and circumstances of the defendant's
> offense indicate a need to protect the public
> because the offense involved actual violence .
> . . .

It is clear from this quotation that the district court agreed with the policy statement, and was not of the view that the specific facts of this case entitled the defendant to leniency on the basis of his alleged "diminished capacity." We have declined to allow a Booker remand in comparable cases, where the "diminished capacity" evidence was available and presented to the district court, "yet [the district court] demonstrated no inclination to consider [it] grounds for departure." United States v. Mojica-Rivera, 435 F.3d 28, 34 (1st Cir. 2006); see United States v. Morrisette, 429 F.3d 318, 325 (1st Cir. 2005) ("For example, in denying the 'diminished capacity' departure, the court stated: '[T]he psychiatric report . . . does not establish that [his] significantly reduced mental capacity contributed substantially to the commission of this offense.'"); see also United States v. Martins, 413 F.3d 139, 154 (1st Cir. 2005) ("Nearly all the factors to which [defendant] alludes were limned in the PSI Report, yet the district court chose not to speak to them at sentencing. The inference is that the court was unimpressed.").

-19-

Even assuming, arguendo, that the above-quoted language was less than clear, the district court gave no other indication at sentencing that it considered the Guidelines sentence either unfair or inappropriate, see Antonakopoulos, 399 F.3d at 81 (stating that there is a powerful argument for remand when a district court has expressed its belief that a Guidelines sentence is unfair or unjust), and instead went out of its way to paint Rojas-Tapia in the most vivid light as a dangerous recidivist. Since the district court exercised its pre-Booker discretion to sentence Rojas-Tapia at the top of the applicable guidelines sentencing range (viz., electing to impose 365 months from a range of 292-365 months), obviously the court was not inclined to be lenient to Rojas-Tapia. See United States v. Tavares, 427 F.3d 122, 126 (1st Cir. 2005) (noting that sentence above bottom of applicable Guidelines range is evidence which undermines Booker remand request). Further, the court emphasized that a lengthy sentence was warranted in the interests of protecting society from this defendant, given the egregious circumstances attending his conduct during the helicopter highjacking. See Baskin, 424 F.3d at 4 (noting that district court's comment that sentence was necessary to protect society may be indicative of court's predilection not to be lenient even under the post-Booker sentencing regime). The district court expressly noted several factors which "certainly tilt the scales in the area of the upper end of the guideline range": (i) Rojas-Tapia was a

recidivist with an extensive criminal history (Category III), including offenses involving violence and firearms, and violations of probation, which "indicates a need to incarcerate the defendant to protect the public"; (ii) the scheme to highjack the helicopter to accomplish the prison escape was fairly complex, elaborate and premeditated, requiring coordination with the prison inmates; (iii) Rojas-Tapia held the helicopter pilot at gunpoint for hours, threatened to shoot and kill him, and repeatedly struck him in the face; and (iv) the pilot was emotionally traumatized by the experience, so much so that, after his release, he telephoned his wife to ask if his children were alive.

Given these circumstances, we conclude that there is no "reasonable probability that the district court would impose a different sentence more favorable to the defendant under the new advisory Guidelines' Booker regime," see Antonakopoulos, 399 F.3d at 75, and thus affirm the sentence imposed by the district court.

**Affirmed**.