**UNITED STATES of America, Plaintiff,**

v.

**David OQUENDO–RIVAS (05), Defendant.**

**Criminal No. 09–427 (JAF).**

United States District Court, D. Puerto Rico.

Dec. 18, 2012.

Julia Diaz–Rex, Jacabed Rodriguez–Coss, Marcela C. Mateo, United States Attorneys Office, San Juan, PR, Bruce R. Hegyi, United States Department of Justice, Washington, DC, for Plaintiff.

Jose R. Aguayo, Jose R. Aguayo Law Office, San Juan, PR, for Defendant.

### ORDER

JOSE ANTONIO FUSTE, District Judge.

Before the court is a "Motion to Suppress Defendant's Statements" filed by Defendant David Oquendo–Rivas ("Oquendo–Rivas" or "Defendant"). (Docket No. 562.) In his motion, Defendant seeks to suppress statements he made to law enforcement authorities on October 20, 2009. (Docket No. 562.) The government opposes. (Docket No. 601.) On December 3, 2012, we held a hearing on the matter. (Docket No. 677.) At the hearing, Investigating Officer Carlos Rodríguez–Negrón ("Officer Rodríguez") of the Puerto Rico Police Department and Special Agent Julio Enríquez–Torres ("Agent Torres") of the Bureau for Alcohol, Tobacco and Firearms both testified on direct and cross-examination. (*Id.*) A full transcript of our hearing is available at Docket No. 678. For the following reasons, Defendant's motion will be denied.

In his briefing papers and at our hearing on the matter, Defendant seeks to suppress the statements he made to Officer Rodríguez and to Agent Torres. We deal with each set of statements separately.

First, Defendant argues for suppression of the statements he gave to Officer Rodríguez. He argues that a statement he gave regarding a gun license should be suppressed because of the officer's alleged failure to advise him of his rights under *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). (Docket No. 562 at 7.) Defendant next argues that each statement after that should be suppressed as the product of an illegal arrest. (*Id.*) Finally, Defendant argues that his post-*Miranda* statements to Officer Rodríguez should be suppressed, because Defendant did not make a "knowing and intelligent" waiver of his *Miranda* rights. For the reasons explained below, we reject each of these arguments.

With respect to his statements to Agent Torres, Defendant argues these statements should be suppressed because the government did not honor his expressed invocations of the right to remain silent and to speak with an attorney. For the reasons that follow, we reject each of these arguments as well.

### I.

### Facts

We have reconstructed the following factual account based largely on the uncontradicted testimony of Officer Rodríguez and Agent Torres. We begin by noting

our favorable credibility assessments of both agents. Throughout their testimony, both agents exhibited a calm, composed, and professional demeanor. Their accounts of the relevant events flowed naturally and appeared straightforward and honest. Both agents have several years of experience and professional training, which were on display in our courtroom.

Following an October 17 multi-victim shooting at La Tómbola Bar in Toa Baja, the Puerto Rico Police Department ("PRPD") opened an investigation. They received information that three or four individuals involved in the La Tómbola shooting were hiding in a nearby neighborhood known as Sector 26.

Shortly after 2:00 P.M., the Puerto Rico Police Department dispatched members of their Bayamón Strike Team, a joint PRPD–Federal task force, to conduct interviews in the neighborhood and to perform a preliminary investigation. Six members of the strike team, including Officer Rodríguez, deployed to the area in two marked police vehicles.

Upon arriving in Sector 26, officers observed four or five individuals standing outside a residence along Road 867. Two of the individuals were Defendant and Christian Ortiz–Rivera ("Ortiz–Rivera"). As Officer Rodríguez exited his vehicle, he observed Defendant remove a firearm from underneath his shirt and brandish it to his side. Officer Rodríguez removed his own firearm, identified himself as a law enforcement officer, and ordered the entire group to stop moving.

Defendant and Ortiz–Rivera turned and fled up a flight of stairs to the second story of the residence. Officer Rodríguez pursued them. He found the pair in a small area separated into two rooms by a makeshift partition: Defendant was to the left of the partition and Ortiz–Rivera was to the right.

Officer Rodríguez witnessed Defendant throw a firearm through a gap between the residence's zinc roof and a structural wall. He also witnessed Ortiz–Rivera attempt to conceal two loaded firearms and two magazines of ammunition in a clothes hamper.

Officer Rodríguez demanded that Defendant and Ortiz–Rivera drop their weapons and get on the ground. Defendant ignored the instructions and walked towards Officer Rodríguez. With his firearm in one hand, Officer Rodríguez subdued Defendant and placed him on the ground. At this time, Officer Roberto Cruz ("Officer Cruz") joined Officer Rodríguez and assisted him in subduing Defendant. Officer Rodríguez then turned to Ortiz–Rivera and laid him down on the ground. The officers handcuffed Defendant and Ortiz–Rivera and moved them to a small sofa at the rear of the room. This all happened in a matter of seconds. Officer Rodríguez asked both men if they possessed a license to carry the firearms. Defendant and Ortiz–Rivera said they did not. Officer Rodríguez then placed both men under arrest and advised them of their constitutional rights.

Upon finishing the recitation of the *Miranda* warnings, both Defendant and Ortiz–Rivera, without prompting, said they understood the warnings and they told officers the weapons belonged to them, but that neither they nor the weapons had anything to do with the shooting at the La Tómbola bar. In the original Spanish, the declaration was, "Estamos claros, las armas son de nosotros pero no tenemos nada que ver con la Tómbola.".

While waiting for technical services to complete a survey of the residence, Officer Rodríguez retrieved two firearms—one with an obliterated serial number—and two ammunition clips from the clothes

hamper upstairs in the residence. Officer Rodríguez also collected a firearm from a paved driveway alongside the residence— the same weapon Defendant had thrown between the zinc roof and a structural wall.

Approximately forty minutes after officers arrested Defendant and Ortiz–Rivera, attorney Jorge L. Armenteros–Chervoni ("Armenteros") appeared at the residence. At that time neither Defendant nor Ortiz– Rivera had requested counsel. Because he was unable to identify the names of either of the two men he said he represented, the officers denied Armenteros entrance to the scene.

Officers informed Defendant and Ortiz– Rivera that an attorney had arrived at the residence and asked whether this attorney represented them. They both said that they had not contacted an attorney. While they were in the custody of PRPD at the residence, neither Defendant not Ortiz– Rivera asked to contact an attorney.[1]

ATF Special Agent Julio Enríquez–Torres ("Agent Torres") arrived at the residence. Officer Rodríguez gave a general overview of what had occurred at the residence, including the names of Defendant and Ortiz–Rivera and descriptions of the firearms and ammunition that he had collected at the residence. Officer Rodríguez instructed Special Agent Torres to meet him at the Bayamón Headquarters.

Officer Rodríguez maintained custody of Defendant and Ortiz–Rivera, taking them to headquarters in Bayamón approximately two hours after their initial detention. Upon arriving at the headquarters, Officer Rodríguez gave both Defendant and Ortiz–

Rivera written *Miranda* warnings translated into Spanish. Defendant indicated on his document that he did not wish to speak. He signed the form at 4:50 in the afternoon. After receiving the signed form from Defendant, Officer Rodríguez did not ask Defendant any questions.

Around this time Agent Torres ("Agent Torres") arrived at the Bayamón headquarters. Officer Rodríguez left defendant in a detention room and went to speak with Agent Torres. Officer Rodríguez and Agent Torres spoke briefly about whether Defendant 19 and Ortiz–Rivera should be charged under state or Federal laws.

Following this conversation, Agent Torres arranged to speak with Defendant and Ortiz–Rivera. Agent Torres spoke with Defendant first. He introduced himself to Defendant as an ATF special agent working for the federal government. Agent Torres gave Defendant a copy of ATF Form 3200, an advisement of rights and waivers.[2] The document contains *Miranda* warnings. Defendant read the document and made a notation: "No entiendo eso. Mi abogado habla." This is translated as: "I don't understand that. My lawyer speaks." Agent Torres then asked Defendant what part of the waiver he didn't understand. Defendant responded that he wanted to speak about the events of that day, but not about La Tómbola.

Agent Torres then asked Defendant to circle the part of the form indicating his willingness to speak without the presence of the lawyer. With Agent Torres and a witness present, Defendant did circle that portion of the waiver and then signed the

---

1. We are troubled by the sudden appearance of this attorney at the scene of the arrest at Sector 26. The circumstances are quite suspicious. The arrestees did not have a professional relationship with the attorney and the attorney had no idea who the arrestees were.

2. A copy of this document, in its original Spanish, was admitted into evidence as Government's Exhibit 10.

document. Agent Torres then signed the document and continued with the interview.

Defendant then proceeded to tell Special Agent Torres that the 45 pistol found outside the residence belonged to him. Defendant told Agent Torres that he had paid $3,100 for the pistol and that it was loaded with ten rounds of ammunition. Defendant also told Agent Torres that Ortiz–Rivera had been in possession of two firearms. Agent Torres asked Defendant if he knew that one of the firearms in Ortiz–Rivera's possession had an 19 obliterated serial number and Defendant said he did.

Agent Torres' interview of Defendant lasted approximately ten to fifteen minutes. After speaking with Defendant, Special Agent Torres asked to speak with Ortiz–Rivera. Agent Torres conducted an interview with Ortiz–Rivera several hours later, sometime around 6:30 in the evening. When he finished speaking with Ortiz–Rivera, Agent Torres spoke with Assistant United States Attorney Warren Vázquez, who instructed Agent Torres to take custody of Defendant and Ortiz–Rivera.

## II.

### *Analysis*

#### A. *Statements to Agent Rodríguez*

■ Defendant argues that the statements he gave to Agent Rodríguez should be suppressed because the officer failed to notify him of his *Miranda* rights. (Docket No. 562 at 6–7.) The government responds that all of Defendant's statements are admissible because Defendant spoke during a lawful *Terry*-type intervention, during which the Constitution does not require an officer to give a *Miranda* warning. (Docket No. 601 at 10–11.) We agree with the government.

■ "*Miranda* warnings must be given before a suspect is subjected to custodial interrogation." *United States v. Trueber*, 238 F.3d 79, 90 (1st Cir.2001) (quoting *United States v. Ventura*, 85 F.3d 708, 710 (1st Cir.1996)). A *Terry*-type intervention, however, is not a custodial interrogation. Under *Terry v. Ohio*, an officer may "stop and briefly detain a person for investigative purposes," and "diligently pursue a means of investigation ... likely to confirm or dispel their suspicions quickly." *Trueber*, 238 F.3d at 92, quoting *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). "As a general rule, *Terry* [interventions] do not implicate the requirements of *Miranda* because '*Terry* [interventions], though inherently somewhat coercive, do not usually involve the type of police dominated or compelling atmosphere which necessitates *Miranda* warnings.'" *Trueber*, 238 F.3d at 90 (internal citations omitted). *Miranda* warnings are required, however, if a *Terry* intervention "escalate[s] into a formal arrest." *United States v. Nishnianidze*, 342 F.3d 6, 8 (1st Cir.2003).

Here, there is no dispute that Officer Rodríguez initially detained Defendant in a valid *Terry*-type intervention after Defendant fled with a firearm. *See Terry v. Ohio*, 392 U.S. at 22, 88 S.Ct. 1868 (courts should ask first whether an officer's actions were justified at their inception). The question concerns what happened next: Whether Defendant's encounter with Officer Rodríguez had become a formal arrest by the time Officer Rodríguez questioned Defendant about his gun license. If so, the Constitution requires *Miranda* warnings, which the Defendant did not receive. If not, Officer Rodríguez's question was constitutionally permissible as part of an investigative *Terry*-type intervention.

To determine whether Defendant was in formal custody at the time of the relevant questioning, we ask "how a reasonable man in the suspect's position would have understood his situation" based on "all of the circumstances surrounding the interrogation." *United States v. Nishnianidze*, 342 F.3d 6, 8 (1st Cir.2003) (quoting *Stansbury v. California*, 511 U.S. 318, 322, 114 S.Ct. 1526, 128 L.Ed.2d 293 (1994)). We consider several factors, including "whether the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the interrogation." *Id.* (quoting *United States v. Masse*, 816 F.2d 805, 809 (1st Cir.1987)).

Applying those factors to the testimony before this court, we conclude that Officer Rodríguez's gun-license question did not constitute a custodial interrogation requiring him to give Defendant *Miranda* warnings. Officer Rodríguez asked the gun-license question while Defendant was in a familiar setting: A residence into which he had voluntarily run. *See id.* (not a formal arrest where agents questioned defendant in a familiar location). Only two officers were present, a number equal to the number of suspects being detained and hardly an overwhelming display of force. *See id.* (not a formal arrest where three agents interviewed a single individual). Although Defendant wore handcuffs, that fact is not inconsistent with a *Terry*-type intervention, particularly as here, where officers justifiably used handcuffs to ensure their safety while investigating suspects known to be armed. *See United States v. Rabbia*, 699 F.3d 85 (1st Cir.2012). And certainly, the duration and character of the interrogation does not indicate a formal arrest: Officer Rodríguez asked a single question, which took no more than a few seconds to both ask and answer. *See United States v.*

*McCarthy*, 77 F.3d 522, 531 (1st Cir.1996) (seventy-five minute detention in police vehicle was not a de-facto arrest).

Defendant's counterarguments are to no avail. Defendant claims that he must have been under arrest when questioned because, later at the suppression hearing, Officer Rodríguez himself said that he had "arrested" Defendant at that point. But that is irrelevant: "The subjective intent of the agents ... has no bearing on determining whether police conduct transformed an investigative stop into a de facto arrest." *Trueber*, 238 F.3d at 92 (citing *Berkemer v. McCarty*, 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1985)).

Defendant also claims that the presence of a weapon and the use of handcuffs indicate that he was formally under arrest when questioned. But although these coercive tactics may be suggestive of custody, *see United States v. McCarty*, 475 F.3d 39, 45 (1st Cir.2007) (defendant was in custody because he was in handcuffs), they are not dispositive standing alone. *United States v. Verdugo*, 617 F.3d 565, 570 (1st Cir.2010) ("neither the use of handcuffs nor the drawing of a weapon necessarily transforms a valid *Terry* [intervention] into a de facto arrest") (quoting *United States v. Fornia–Castillo*, 408 F.3d 52, 64 (1st Cir.2005)). Here, we find that there were clear threats to the officer's safety that compelled his decision to draw his weapon and use handcuffs. Officer Rodríguez was outnumbered, in unfamiliar territory, in the presence of two armed suspects. Under these circumstances, it was a perfectly reasonable decision to raise his weapon, and then restrain both defendants in handcuffs. *See Fornia–Castillo*, 408 F.3d at 64 (noting the "reasonable safety concerns" that drove police officer's decisions to use handcuffs and weapons). Moreover, the conduct of

the agents was not "bellicose" or "confrontational;" to the contrary, the officer described repeatedly that that he avoided using any excessive force or shows of authority. *Id.* For example, the officer stated that he subdued Defendant without landing any blows, and that he kept his gun at a 45–degree angle when he was attempting to subdue Ortiz–Rivera.

Therefore, we conclude that the pre-*Miranda* statement regarding the gun license occurred during a permissible *Terry*-type intervention. The case law is clear that "*Miranda* warnings are not required for 'a brief period of detention' during which the police seek 'by means of a moderate number of questions to determine a suspect's identity and to obtain information confirming or dispelling their suspicions.'" *United States v. Parker*, 549 F.3d 5, 9 (1st Cir.2008) (quoting *Trueber*, 238 F.3d at 93). As in *Parker*, we find that Defendant's admission that he lacked a license for the gun "occurred early in the period of detention and, under the *Terry* line of cases, it was not the result of a 'custodial line of interrogation of the kind requiring *Miranda* protection.'" *Id.*

Next, we turn to the Defendant's spontaneous declaration ("Estamos claros, las armas son de nosotros pero no tenemos nada que ver con la Tómbola."),[3] which occurred after Officer Rodríguez read Defendant his *Miranda* rights. Defendant argues there are two reasons why this statement should be suppressed. Neither argument is persuasive.

First, Defendant argues that this statement ("Estamos claros ...") should be suppressed because it was obtained pursuant to an illegal arrest triggered by Defendant's answer to the impermissible gun-license question. We have already explained, though, that the gun-license question was permissible under *Terry*, and could not have rendered Defendant's arrest illegal. Even if the gun-license question were impermissible and thus not grounds for arresting Defendant, Officer Rodríguez had probable cause to arrest Defendant for having fled while brandishing a firearm, which he later attempted to dispose.

Next, Defendant argues that Officer Rodríguez's account of Defendant's spontaneous statement is not credible. In the words of defense counsel, it "quite frankly stretches credibility" to think that Oquendo–Rivas would blurt this statement out after being read his rights. (Docket No. 562 at 8.) As we explained during the hearing, we disagree with defense counsel's interpretation. We think that such a statement could easily be seen as revealing a guilty conscience and an intense desire to dissuade police at the outset from linking an individual to an ongoing investigation. Officer Rodríguez's account is plausible, and as we stated earlier, we have no reason to doubt the veracity of Officer Rodríguez's statements, including his recounting of this spontaneous declaration.

Defendant separately argues that his post-*Miranda* statements to Officer Rodríguez should be suppressed, because Officer Rodríguez failed to inquire whether Defendant understood his rights. (Docket No. 562 at 9.) Defendant has made very little legal argument in support of this theory, placing it in danger of waiver. *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir.1990) (arguments not developed are waived). Nevertheless, we will construe Oquendo–Rivas' argument as alleg-

---

**3.** "We are clear, the weapons are ours, but we have nothing to do with la Tómbola." (Translation ours.) In colloquial, informal Spanish, "estamos claros" is the equivalent of saying "Ok, Ok, understood."

ing that his waiver of his *Miranda* rights was not "knowing and voluntary." *See United States v. Mejia*, 600 F.3d 12, 16 (1st Cir.2010) ("any waiver of the *Miranda* rights to silence and access to an attorney must be both knowing and voluntary") (citing *United States v. Rojas–Tapia*, 446 F.3d 1, 4 (1st Cir.2006)).

▮▮▮ The case law is clear that "while courts must presume that a defendant did not waive his *Miranda* rights absent an express waiver, 'that does not mean that the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver, may never support a conclusion that a defendant has waived his rights.'" *Id.* (quoting *North Carolina v. Butler*, 441 U.S. 369, 373, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979)). Thus, an implied waiver can be "inferred from the actions and words of the person interrogated." *Id.* (quoting *Butler*, 441 U.S. at 373, 99 S.Ct. 1755). To make such a finding, "we must examine the 'totality of the circumstances surrounding the interrogation' to determine whether the defendant made both an 'uncoerced choice' and had the 'requisite level of comprehension' such that a court may properly conclude that the defendant waived his *Miranda* rights." *Id.* (quoting *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986)).

Here, based on the totality of the circumstances, we conclude that Defendant waived his *Miranda* rights when he spontaneously spoke to Officer Rodríguez after being read his rights. Defendant's statement ("We are clear. The guns are ours but we had nothing to do with la Tómbola.") sufficiently indicates that Defendant understood his rights and was waiving them. Defense counsel argues that Oquendo–Rivas' statement that "We are clear" relates to the clause that follows, rather than to his understanding of his

*Miranda* rights. But, defense counsel has provided no developed argument about why this interpretation is more correct than Officer Rodríguez's interpretation. Based on the testimony we heard from Officer Rodríguez, and based on this court's own understanding of common usage, we believe that Officer Rodríguez's interpretation was sound: Defendant's declaration that he was "clear" indicated he understood his rights. Nor is there any indication, based on the circumstances here, of any coercion or lack of understanding. Officer Rodríguez's actions and his handling of the Defendants were free of any untoward pressure or deception. His explication of the *Miranda* rights was straightforward, in Defendant's native language, and we can infer from his description that the Defendant waived his rights by speaking spontaneously to Officer Rodríguez.

### B. *Statements to Agent Torres*

▮▮▮ Defendant's final argument is that he had successfully invoked his rights to counsel, and that Officer Rodríguez and Agent Torres violated that right when they continued to interrogate him. In support of his argument, Defendant cites *Michigan v. Mosley*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975), and *United States v. Andrade*, 135 F.3d 104 (1st Cir.1998). Neither argument prevails.

▮▮▮ In *Mosley*, the Supreme Court held that the admissibility of a suspect's statements under *Miranda* depends on whether a person's "right to cut off questions" was "scrupulously honored." 423 U.S. at 104, 96 S.Ct. 321. There, the Supreme Court also identified four factors that should inform this analysis:

(1) whether a significant amount of time lapsed between the suspect's invocation of the right to remain silent and further questioning; (2) whether the same offi-

cer conducts the interrogation where the suspect invokes the right and the subsequent interrogation; (3) whether the suspect is given a fresh set of *Miranda* warnings before the subsequent interrogation; and (4) whether the subsequent interrogation concerns the same crime as the interrogation previously cut off by the suspect.

*United States v. Lugo Guerrero*, 524 F.3d 5, 9 (1st Cir.2008) (citing *Mosley*, 423 U.S. at 104–06, 96 S.Ct. 321). Moreover, the First Circuit has instructed that courts should look at the "totality of the circumstances," and that the "key inquiry remains whether the defendant was in charge of the decision whether and to whom he would speak." *Id.* (internal quotations and citations omitted).

Following these instructions, we first apply the four factors identified by the court in *Lugo Guerrero*, 524 F.3d at 9. On the first score, we must ask whether the time elapsed between the first and second interrogations was "significant." *Id.* This can be a difficult question to answer, because in *Mosley*, the Supreme Court did not state a per-se rule of a minimum amount of time required to be "reasonable." 423 U.S. at 105–106, 96 S.Ct. 321. *See also Weeks v. Angelone*, 176 F.3d 249, 268 (4th Cir.1999) ("A significant period of time between interrogations does not require a durational minimum … Instead, a 'significant period of time' is a function of to what degree the police 'persist[ed] in repeated efforts to wear down [the suspect's] resistance and make him change his mind.'") (quoting *Mosley*, 423 U.S. at 105, 106, 96 S.Ct. 321). Although twenty minutes is shorter than the two hours deemed reasonable in *Mosley*, there is no reason to think this was an unacceptably short time, given the circumstances here and the absence of any signs of pressure or coercion.

Regarding the second and third factors identified in *Lugo Guerrero*, both point in favor of a finding of admissibility. The agent that reinitiated questioning of Defendant (Agent Torres) was a different agent than the one to whom Defendant had invoked his right to remain silent (Officer Rodríguez). Furthermore, as an agent of the Federal government, Agent Torres' interrogation was at the behest of an entirely separate sovereign. Additionally, Agent Torres provided Defendant with a new set of *Miranda* warnings in the ATF 3200F form he provided. The fourth *Lugo Guerrero* factor, however, favors Defendant, since the crime that Agent Torres asked about—the gun violation—was the same one that had been the subject of the earlier interrogations. So, viewing the first factor of time elapsed in the light most favorable to the defendant, the first four factors are somewhat inconclusive.

But, as the court stated in *Lugo Guerrero*, this is far from the end of the matter; the "key inquiry remains whether the defendant was in charge of the decision whether and to whom he would speak." *Id.* Here, the evidence suggests Defendant did remain in charge of those decisions. The environment in which Defendant was interrogated at the Bayamón police station, as described by both Officer Rodríguez and Agent Torres, was free from any coercion or efforts to wear down Defendant's will. Based on the testimony provided to us, we have no problem concluding that Defendant remained in charge at all times of "the decision whether and to whom he would speak." *Id.* Agent Torres was the only officer who interviewed the suspect other than Officer Rodríguez, and his treatment of Defendant was respectful and even-handed.

Nor does Andrade provide any help to Defendant. That case simply restated Supreme Court precedent to the effect that

"where the suspect asserts that he wants to consult with counsel, questioning must cease until counsel is provided .... But when a defendant invokes his right to remain silent, *Mosley* makes clear that the police are not automatically forbidden from later resuming interrogation." (internal citations and quotations omitted). Here, Defendant did not assert to Officer Rodríguez that he wished to consult with counsel; therefore, the police were not "automatically forbidden" from reinitiating interrogation after later providing him with new *Miranda* warnings. *See Lugo Guerrero*, 524 F.3d at 12 (construing *Andrade* in same way).

 Finally, Defendant argues that he unambiguously invoked his right to counsel, which Agent Torres failed to honor. (Docket No. 562 at 10.) Again we disagree. "[A]fter a knowing and voluntary waiver of the *Miranda* rights, law enforcement officers may continue questioning until and unless the suspect clearly requests an attorney." *Davis v. United States*, 512 U.S. 452, 461, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994). Here, we find that Defendant made a knowing and voluntary waiver. When Defendant initially indicated that he did not understand something, Agent Torres asked Defendant what he did not understand. The Defendant explained that he was willing to talk about the events of the day without a lawyer present, but not about La Tómbola. Agent Torres then confirmed this understanding with the Defendant and asked him to sign the waiver and clearly indicate his willingness to speak without an attorney present. Defendant agreed and circled the line indicating his waiver of his rights to remain silent. Defendant then signed the waiver. This was a "knowing and voluntary waiver" of his rights to remain silent. *Davis*, 512 U.S. at 461, 114 S.Ct. 2350. The interview then lasted only ten or fifteen minutes, with Agent Torres honoring Defendant's wish not to discuss La Tómbola without a lawyer present. There is no evidence that, at any point during the interview, Defendant indicated he wished to speak with a lawyer. The first notation that he made, "Yo no entiendo, mi abogado habla," was not an unambiguous statement of his desire to speak with counsel, especially given his explanation of his wish to speak only about the events of that day, but not about La Tómbola. *See id.* (requiring clear statement).

### III.

### *Conclusion*

For the foregoing reasons, Defendant's motion is hereby **DENIED.** Neither Defendant's statements made to Agent Torres nor the ones to Officer Rodríguez will be suppressed.

**IT IS SO ORDERED.**